# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **DOLLY E. LUGO-MARTÍNEZ & JESÚS MALAVÉ-SOTO,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE COMMONWEALTH OF PUERTO RICO PLANNING BOARD, THE MUNICIPALITY OF CABO ROJO; MR. LUIS LÓPEZ (Director of Planning, of the Municipality of Cabo Rojo in his personal and official capacities); MR. EDGARD SEDA (Director of the Permits Division of the Municipality of Cabo Rojo in his personal and official capacities); MR. JOSÉ RAMOS, (Field Inspector of the of the Municipality of Cabo Rojo in his personal and official capacities); MR. CARLOS RIVERA (Director of the Permits Division at the Municipality of Cabo Rojo in his personal and official capacities); MR. RICHARD PÉREZ (Permits Technician of the Municipality of Cabo Rojo in his personal and official capacities); X, Y, AND Z INSURANCE COMPANIES;**<br><br>**Defendants.** | **CIVIL NO. 25-1529_(____)**<br><br>**Federal Civil Rights Violations Jury Trial Demanded** |

## VERIFIED COMPLAINT

**COME NOW,** Plaintiffs Mr. JESÚS MALAVÉ-SOTO and Ms. DOLLY E. LUGO-MARTÍNEZ (hereinafter referred to as the Plaintiffs) respectfully submit this Verified Complaint against officials who work in the MUNICIPALITY OF CABO ROJO in their personal and official capacities and the COMMONWEALTH OF PUERTO RICO's PLANNING BOARD, and the MUNICIPALITY OF CABO ROJO as a public entity, through their undersigned attorney, and respectfully state, allege and pray as follows:

## I.    INTRODUCTION

I.1.    This is a civil action seeking declaratory and injunctive relief, as well as damages, against the MUNICIPALITY OF CABO ROJO and the COMMONWEALTH OF PUERTO RICO'S PLANNING BOARD, as well as the Co-Defendants named above in their personal and official capacities, for violations of the Plaintiffs' constitutional rights under the First, and Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983. Plaintiffs allege that Defendants have engaged in arbitrary and discriminatory conduct, depriving Plaintiffs of their rights to equal protection and due process under the law.

## II.    JURISDICTIONAL STATEMENT

**VERIFIED COMPLAINT**                                                                     3
Dolly E. Lugo Martínez, et al. v.  Commonwealth of Puerto Rico Planning Board, et al.
Civil No. 25-1529 (_____)

II.1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this case arises under the Constitution and laws of the United States, specifically under 42 U.S.C. § 1983, which provides a cause of action for the deprivation of rights secured by the First and Fourteenth Amendment Constitution, and 42 U.S.C. § 1988, which permits the recovery of attorney's fees and costs for prevailing parties in civil rights cases.

II.2.      The Plaintiffs are citizens of the United States and a resident of the Commonwealth of Puerto Rico. The Co-Defendants, are public officials from the MUNICIPALITY OF CABOR ROJO who are employees acting under color of state law, being brought in their personal and official capacities.  For purposes of injunctive relief, Plaintiffs include the COMMONWEALTH OF PUERTO RICO'S PLANNING BOARD.

II.3.      The Plaintiffs have evidence that all the Co-Defendants, individually and jointly, deprived their of the right to use, enjoy, and develop their property without due process of law, in retaliation by their First Amendment protected speech, and in violation of the Fourteenth Amendment to the United States Constitution. The actions of the COMMONWEALTH OF PUERTO RICO PLANNING BOARD, THE MUNICIPALITY OF CABO ROJO, and the Co-Defendants in their personal and official capacities including constitute a significant interference with the

**VERIFIED COMPLAINT**                                                          4
Dolly E. Lugo Martínez, et al. v.  Commonwealth of Puerto Rico Planning Board, et al.
Civil No. 25-1529 (____)

Plaintiffs' property rights, thereby violating the Plaintiffs' rights to substantive and procedural due process.

II.4.     As the events giving rise to this action occurred within the jurisdiction of the United States District Court for the District of Puerto Rico, this Court has the authority to hear this case. Additionally, the Plaintiffs seek relief in the form of compensatory and punitive damages, as well as equitable relief, including but not limited to an order compelling COMMONWEALTH OF PUERTO RICO PLANNING BOARD, & THE MUNICIPALITY OF CABO ROJO to comply with applicable laws and regulations regarding property use and development. Thus, venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this claim occurred in the District of Puerto Rico.

II.5.     Therefore, pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has jurisdiction to hear and determine this matter.

### III.  THE PARTIES

III.1. Plaintiffs DOLLY E. LUGO-MARTÍNEZ and JESÚS MALAVÉ-SOTO are residents of the Boquerón District of Cabo Rojo, Puerto Rico.

III.2.  Plaintiff DOLLY E. LUGO MARTÍNEZ is the owner of the property at issue and lives with Plaintiff JESÚS MALAVÉ-SOTO, which is approximately thirteen (13) cuerdas located at kilometer 14 of Highway 100 in Cabo Rojo, Address:

P.R. State Road 100, KM 14.0, Boquerón Ward Cabo Rojo, PR 00623; Telephone (787) 974-7636, E-mail: dlugo.md@gmail.com.

III.3.  Co-Defendant PLANNING BOARD OF THE COMMONWEALTH OF PUERTO RICO is a governmental entity responsible for land use classification and permit issuance in Puerto Rico; with address, P.O. Box 41119,   San Juan, PR 00940-1119, Puerto Rico; Telephone:  (787) 727-8181; Website: www.jp.pr.gov ; http://www.jp.pr.gov.

III.4.  Co-Defendant MUNICIPALITY OF CABO ROJO is a municipal corporation organized under the laws of Puerto Rico located at Calle José A. G. Agrait #53, Cabo Rojo, PR 00623, Puerto Rico, Telephone: (787) 228-1000. Website: www.caborojo.gov.pr ; http://www.caborojo.gov.pr .

III.5.  Co-defendant in his official and personal capacity acting under color of law named MR. LUIS LÓPEZ, is the Director of Planning, of the Municipality of Cabo Rojo located at Calle José A. G. Agrait #53, Cabo Rojo, PR 00623, Puerto Rico,     Telephone:     (787)     228-1000.     Website:     www.caborojo.gov.pr; http://www.caborojo.gov.pr.

III.6.  Co-defendant in his official and personal capacity acting under color of law named MR. EDGARD SEDA, is the Director of the Permits Division  of the Municipality of Cabo Rojo located at Calle José A. G. Agrait #53, Cabo Rojo, PR

**VERIFIED COMPLAINT**                                                                        6
Dolly E. Lugo Martínez, et al. v.  Commonwealth of Puerto Rico Planning Board, et al.
Civil No. 25-1529 (____)

00623, Puerto Rico, Telephone: (787) 228-1000. Website: www.caborojo.gov.pr;

http://www.caborojo.gov.pr.

III.7.  Co-defendant in his official and personal capacity acting under color of law named MR. JOSÉ RAMOS, is the Field Inspector of the of the Municipality of Cabo Rojo located at Calle José A. G. Agrait #53, Cabo Rojo, PR 00623, Puerto Rico, Telephone: (787) 228-1000. Website: www.caborojo.gov.pr; http://www.caborojo.gov.pr.

III.8.  Co-defendant  in his official and personal capacity acting under color of law named MR. CARLOS RIVERA is the Director of the Permits Division at the Municipality of Cabo Rojo located at Calle José A. G. Agrait #53, Cabo Rojo, PR 00623, Puerto Rico, Telephone: (787) 228-1000. Website: www.caborojo.gov.pr; http://www.caborojo.gov.pr.

III.9.  Co-defendant  in his official and personal capacity acting under color of law named MR. RICHARD PÉREZ is the Permits Technician of the Municipality of Cabo Rojo located at Calle José A. G. Agrait #53, Cabo Rojo, PR 00623, Puerto Rico, Telephone: (787) 228-1000. Website: www.caborojo.gov.pr; http://www.caborojo.gov.pr.

III.10. X, Y, and Z Insurance Companies are fictitious names used to represent the insurance companies involved in this matter. These companies are

believed to have issued insurance policies that cover the damages alleged in the complaint. However, the true identities of these insurance companies are not known at the present time.

## IV.  THE FACTS

### IV.A.        Parties and Property Background

IV.A.1.    Plaintiffs reside in the Boquerón District of Cabo Rojo, Puerto Rico. The property at issue belongs to Plaintiff DOLLY E. LUGO-MARTÍNEZ and is composed of approximately thirteen (13) cuerdas located at kilometer 14 of Highway 100 in Cabo Rojo. The Plaintiffs have attempted multiple development projects on this property, including, notably, a proposed emergency room facility, given that the nearest hospital from the neighborhood of Combate is the Metropolitan Hospital in the town center.

IV.A.2.    However, their development efforts have been persistently obstructed by the MUNICIPALITY OF CABO ROJO and the COMMONWEALTH OF PUERTO RICO PLANNING BOARD, together with the named Co-Defendants in their personal and official capacities, who contend that the property lies within an agricultural zone, specifically designated as part of the agricultural reserve of the Lajas Valley. The Plaintiffs acknowledge the COMMONWEALTH OF PUERTO RICO PLANNING BOARD's authority over land use classification and permit

issuance but contend that the Board's actions infringe on their constitutional right to the free enjoyment of their property.

## B.    History of the Property

IV.B.1.    The farm was originally segregated in 1938 by Attorney-Notary López de Victoria. A Planning Board Resolution dated July 12, 1996, designated the property as part of an agricultural district. The Lajas Valley Agricultural Reserve was formally created in 1999 by Law 277 of August 20, 1999, codified at 23 L.P.R.A. § 7031 et seq., which designated lands from Cabo Rojo to Lajas as agricultural terrain, although land uses vary in adjacent areas, including parks, residential neighborhoods, and commercial centers.

IV.B.2.    Law 277 restricts subdivision of properties within the reserve to no less than  fifty (50) *cuerdas*[1] unless exceptional cases arise. The subject property, however, was segregated to its current size of approximately 13.30 *cuerdas* in 1938, before the creation of the Municipal Revenue Collection Center or "Centro de Recaudación de Ingresos Municipales" ("CRIM" by its Spanish acronym).

---

[1] In the context of a recognized dictionary, the Spanish word "cuerdas" translates to "strings" or "cords" in English. See, *Real Academia Española* (2014), Diccionario de la lengua española. (23rd Ed. Madrid: Espasa Calpe). In Puerto Rico, a "cuerda" is a unit of area measurement used for land. It is approximately equal to 0.97 acres or about 3,930 square meters.

VERIFIED COMPLAINT                                                                    9
Dolly E. Lugo Martínez, et al. v.  Commonwealth of Puerto Rico Planning Board, et al.
Civil No. 25-1529 (_____)

IV.B.3.    At the time of Law 277's enactment, the property maintained a classification of Selective Development ("*Desarrollo Selectivo*" or "DS"). Resolution JP-RA-57 issued on February 21, 2014, expanded the Lajas Valley reserve to include parts of La Parguera (quadrants 3, 5, 10, 11, 14, and 19) but made no reference to quadrants 36 or 38, **in which the clients' property lies according to Cabo Rojo Municipality's zoning map approved October 1, 2010.**

IV.B.4.    In instances of conflicting documentation, the written provisions take precedence over cartographic designations.[2] While maps classified the property as agricultural, **the written records have never confirmed such classification**. The property has consistently been classified as Selective Development in the MUNICIPALITY OF CABO ROJO's land use plan since 2010.

---

[2] The Puerto Rico Supreme Court's approach to property identification requirements reinforces this hierarchy. In Pérez Cruz v. Fernández, the Puerto Rico Supreme Court emphasized that the identification required of the plaintiff consists in a showing that the property claimed is the same as that to which reference is made in the documents which the plaintiff introduces in evidence in support of his just title.  See, Perez Cruz v. Fernandez, 101 D.P.R. 365, 375, 1 P.R. Offic. Trans. 508 (May 8, 1973).  The Puerto Rico Supreme Court further established that the location, area and boundaries of the property must be accurately specified, and during the course of the trial it must be proved that the piece of land claimed is the one mentioned in the documents, titles and other means of proof on which the plaintiff bases his claim. Id., *citing*, *Puig Brutau*, Fundamentos del Derecho Civil, (2da. ed., Barcelona: 1971), Tomo III, Vol. I, págs. 176 et seq.; Manresa, Comentarios al Código Civil Español (7ma. ed, Madrid: 1952), Instituto Editorial Reus, Tomo III, págs. 199 et seq.

IV.B.5.   The COMMONWEALTH OF PUERTO RICO'S PLANNING BOARD claims that the property is agricultural by Resolution JP-RA-57, yet the Resolution itself does not mention the property or its quadrants. The Plaintiffs maintain that despite the COMMONWEALTH OF PUERTO RICO'S PLANNING BOARD's position, their property is not subject to the agricultural reserve restrictions.

IV.B.6.   Currently, the property incorrectly bears a reserved agricultural designation per the Lajas Valley Agricultural Reserve plan, which perpetuates the dispute over its legal zoning status which has been use as the pretext by Co-Defendants in their personal and official capacities to discriminate against Plaintiffs.

## C.   Terrain Development Since Plaintiffs' Ownership

IV.C.1.   The Plaintiffs acquired the property in 2017 through a mortgage and have duly paid property taxes, maintaining an escrow account for this purpose. The Plaintiffs assert that, according to the MUNICIPALITY OF CABO ROJO's Land Use Plan, the property is classified as DS and does not qualify as agricultural land.

IV.C.2.   A disconnect remains with the COMMONWEALTH OF PUERTO RICO'S PLANNING BOARD regarding cadastral[3] segregation, as the property was

---

[3] The term cadastral has well-established legal definitions in both dictionary sources and statutory law. The most comprehensive and current definition comes from federal statute 43 U.S.C. § 776, which defines cadastre as an inventory of real property developed through collecting, storing,

**VERIFIED COMPLAINT** 11
Dolly E. Lugo Martínez, et al. v.  Commonwealth of Puerto Rico Planning Board, et al.
Civil No. 25-1529 (_____)

not officially segregated from the original cadastral number until 2017. The Plaintiffs have since obtained a new cadastral number. At their request, the COMMONWEALTH OF PUERTO RICO'S PLANNING BOARD issued a certification regarding the land classification.

IV.C.3.   Between 2018 and 2019, the Plaintiffs submitted two (2) location inquiries proposing an emergency room and additional developments, both denied by the MUNICIPALITY OF CABO ROJO due to the COMMONWEALTH OF PUERTO RICO'S PLANNING BOARD classification of the property as agricultural. On March 13, 2019, Plaintiffs formally requested a zoning change, which the COMMONWEALTH OF PUERTO RICO'S PLANNING BOARD denied in January 2020. Subsequently, the clients filed suit at the Commonwealth of Puerto Rico's State Court on March 4, 2020. Thus, Plaintiffs exhausted all State Law available remedies as evidenced in the civil case Dolly E. Lugo Martínez v. Junta de Planificación, Civil No. SJ2020CV02007 (803)(T.P.I. San Juan) *affirmed by* the Puerto Rico Court of Appeals, San Juan Region, KLAN202000867 on December

---

retrieving, or disseminating graphical or digital data depicting natural or man-made physical features, phenomena, or boundaries of the earth, and any information related to the data. 43 U.S.C.A. § 776.  *Black's Law Dictionary* defines *cadastre* as a survey and valuation of real estate in a county or region compiled for tax purposes. See, Black's Law Dictionary (11th ed. 2019). *Webster's Third New International Dictionary* defines cadastral as of or relating to the records of a *cadastre*: concerned with assembling or keeping the records necessary to the *cadastre* and of a map or survey: showing or recording property boundaries, subdivision lines, buildings, and other details. See, Webster's Third New International Dictionary (3rd ed. 1961).

18, 2020, by which so case does not constitute any *res judicata* and/or collateral estoppel.

IV.C.4.    After the COMMONWEALTH OF PUERTO RICO PLANNING BOARD's failure to appear, the State Court of First Instance entered default judgment in favor of the Plaintiffs. However, the State Court of First Instance ultimately ruled it lacked jurisdiction to amend the zoning plan. Plaintiffs appealed, but the Court of Appeals upheld the decision. An attempt to further pursue the issue through an administrative segregation request in June 2024 has since stalled.

IV.C.5.    Before the 2020 elections, the Plaintiffs submitted a segregation proposal worth approximately $2 million dollars. They had an amicable relationship with the prior Mayor of the MUNICIPALITY OF CABO ROJO but no cooperation from the current administration. On the contrary. In retaliation, a Joint Regulation was repealed in 2019 and an emergency regulation classified the property as selective development and rural land during ongoing litigation.

## D.    Attempts to Develop the Property and Denial of Use

IV.D.6.    The Plaintiffs have constructed a 120-foot-long building on the property, classified commercially, consisting of four (4) rooms internally connected, with a building permit obtained in 2022. Despite this, the MUNICIPALITY OF CABO ROJO has withheld the use permit necessary to occupy the building.

IV.D.7.    The property was listed in the preliminary land use plan as C1 (commercial). The MUNICIPALITY OF CABO ROJO's onerous requirements for use permits have effectively prevented Plaintiffs from developing or enjoying the property.

IV.D.8.    The property remains vacant. Should use permits be granted, Plaintiffs intend to modify and use it as a residence. Initial construction started in 2022 and was estimated to be complete by August or September 2024, but due to the facts set forth herein has not been completed.

IV.D.9.    On    August    26,    2024,    Plaintiffs,    accompanied    by    the MUNICIPALITY OF CABO ROJO's Mayor, legal advisor, and hired engineer, resumed discussions with the Puerto Rico's Planning Board following a prior meeting on April 29, 2024, in which a commitment to resolve the dispute had been made.

## E.    Current Segregation Proposal and Legal Concerns

IV.E.1.    The Puerto Rico Planning Board is supposed to operate under comprehensive statutory authority established by the Planning Board Organic Act, which grants the Board responsibility for guiding the integral development of Puerto Rico and setting policies in the areas of development, distribution of population, use of the land and other natural conditions.

**VERIFIED COMPLAINT**                                                     14
Dolly E. Lugo Martínez, et al. v.  Commonwealth of Puerto Rico Planning Board, et al.
Civil No. 25-1529 (_____)

IV.E.2.    The Puerto Rico Planning Board's zoning decisions must comply with established Land Use Plans, which serve as the basis for the preparation and revision of the zoning maps. Any development project must be in accordance with the recommendations of the Land Use Plans, emphasizing the importance of comprehensive planning principles over individual property interests. This framework requires careful consideration of how new commercial developments interact with existing large retail operations, not like in the instant case.  As shown in the pictures below, co-Defendants discriminate in a zoning permit of their property since very nearby, less than 212.53 meters from the property, there is an industrial hardware store bigger than a Home Depot named "Ferretería MR, LLC".

IV.E.3.    The Plaintiffs seek to segregate and sell the thirteen (13) *cuerdas*, submitting a  project proposing fourteen (14) lots. The Explanatory Memorandum filed June 21, 2024, requests this subdivision with remainder, noting the property's cadastral number 356-000-008-86, location outside the agricultural reserve boundaries, flat and semi-flat topography, commercial characteristics, accessibility, and compatible soil types.

IV.E.4.    The proposal includes necessary infrastructure such as water, electricity, telephone, and paved internal roads, with compliance to all applicable

agency requirements. The project is consistent with surrounding neighborhood lot sizes and does not adversely impact health, safety, or welfare.

IV.E.5.   Despite these efforts, government entities refuse to process the project development using the pretext of the agricultural classification, which Plaintiffs dispute.

IV.E.6.   Nevertheless, the COMMONWEALTH OF PUERTO RICO PLANNING BOARD permitted an adjacent property for twenty-three (23) residential lots despite flood risk, highlighting an inconsistent application of zoning and permitting standards. Plaintiffs have also submitted to location consultation processes accordingly.

IV.E.7.   For example, Plaintiffs hereby submit a picture that demostrate that Co-Defendants Government Officials discriminate in a zoning permit of their property since very nearby, less than 212.53 meters from the Plaintiffs' property, there is an industrial hardware store bigger than a Home Depot, named "Ferretería Industrial MR, LLC".

**VERIFIED COMPLAINT**                                                    16
Dolly E. Lugo Martínez, et al. v.  Commonwealth of Puerto Rico Planning Board, et al.
Civil No. 25-1529 (____)



**VERIFIED COMPLAINT** 17
Dolly E. Lugo Martínez, et al. v. Commonwealth of Puerto Rico Planning Board, et al.
Civil No. 25-1529 (____)



**VERIFIED COMPLAINT**                                                                 18
Dolly E. Lugo Martínez, et al. v.  Commonwealth of Puerto Rico Planning Board, et al.
Civil No. 25-1529 (_____)



**VERIFIED COMPLAINT** 19
Dolly E. Lugo Martínez, et al. v.  Commonwealth of Puerto Rico Planning Board, et al.
Civil No. 25-1529 (____)



IV.E.8.   Here is a picture of the Plaintiffs' Property, by which could be corroborated by the **EXHIBIT 1** of the instant Verified Complaint that is a recent assessment of the property by a Certified Appraiser.

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisals & Consultants*
*Condado Moderno Dev./B-6, 1st Street*
*Caguas, Puerto Rico 00725*
*PO Box 1181/Caguas, PR 00726-1181*

**APPRAISAL REPORT**
**OF**

**PR State Road 100, KM 14.0**
**Boquerón Ward**
**Cabo Rojo, PR 00623**

# Commercial Building



**PREPARED BY:**
MILTON FLORES, MIE CREA
*Professional Real Estate Appraiser, #706EPA*
*General Certified Appraiser, No. 162GC*

**PREPARED FOR:**
*Ms. Erika Salgado Sanabria*
*Credit & Service Supervisor*
*MediCoop*
*PO Box 194450*
*San Juan, PR 00919-4450*

IV.E.9.    Plaintiffs therefore allege that the COMMONWEALTH OF PUERTO RICO'S PLANNING BOARD, the MUNICIPALITY OF CABO ROJO and the above-mentioned Co-Defendants in their personal and official capacities' insistence on the agricultural classification and refusal to process development or permits violates their constitutional rights to property use and enjoyment and constitutes arbitrary and capricious administrative conduct.

**F.     Specific meetings that demonstrate bias and discrimination by the Commonwealth of Puerto Rico Government officials in their personal capacities.**

IV.F.1.    In the years 2023 and 2024, despite the Plaintiff JESÚS MALAVÉ-SOTO's repeated efforts to engage constructively with officials in the MUNICIPALITY OF CABO ROJO, including multiple meetings with the long-serving Director of Planning, Co-Defendant Mr. LUIS LÓPEZ, the Plaintiffs encountered patterns of discriminatory treatment.

IV.F.2.    Specifically, in March 2024, during a meeting at the Restaurant El Puente Tropical with Mayor Jorge Morales and Engineer Mike Lugo (the Plaintiff's Expert Engineer), Plaintiffs experienced subtle dismissals and unequal treatment compared to other parties, like for example, the "**Proyecto Esencia**".

**VERIFIED COMPLAINT**                                                          22
Dolly E. Lugo Martínez, et al. v. Commonwealth of Puerto Rico Planning Board, et al.
Civil No. 25-1529 (____)

IV.F.3.    On April 29, 2025, at a 9:00 am meeting at the COMMONWEALTH OF PUERTO RICO PLANNING BOARD in San Juan, even with the presence of key figures — including the Mayor of the MUNICIPALITY OF CABO ROJO, the Mayor's driver, the Director of the Legal Division of the COMMONWEALTH OF PUERTO RICO PLANNING BOARD Attorney Marrero, Director of Planning Mr. Luis Lopez, expert Engineer Mike Lugo, and the Plaintiff JESÚS MALAVÉ-SOTO was conducted.    There, Plaintiff JESÚS MALAVÉ-SOTO was subjected to differential treatment that hindered fair consideration of both Plaintiffs' interests.

IV.F.4.    In June 2024, when Co-Defendant MR. EDGARD SEDA, Director of the Permits Division, and Co-Defendant MR. JOSÉ RAMOS, Field Inspector, inspected the Plaintiffs' project, there were indications that inspection protocols were applied more stringently to the Plaintiffs than to others, being a biased enforcement.

IV.F.5.    Subsequently, on August 26, 2024, during a follow-up meeting at the COMMONWEALTH OF PUERTO RICO'S PLANNING BOARD, the Plaintiffs, despite having Expert representation and presence alongside various officials including Attorney Marrero, Co-Defendant MR. RIVERA LAZÚ, the MUNICIPALITY OF CABO ROJO'S Mayor, and others, continued to face unequal

procedural treatment and marginalization against Plaintiffs JESÚS MALAVÉ-SOTO & DOLLY E. LUGO MARTÍNEZ.

IV.F.6.    In October 2024, the Project Inspection held by Co-Defendant MR. EDGARD SEDA and Co-Defendant MR. JOSÉ RAMOS again demonstrated a disproportionately scrutinizing approach applied to the Plaintiffs' project.

IV.F.7.    Lastly, in August 2025, during a City Hall at the MUNICIPALITY OF CABO ROJO meeting with the newly appointed Director of the Permits Division, Co-Defendant MR. CARLOS RIVERA, and Co-Defendant MR. RICHARD PÉREZ, Permits Technician, Plaintiffs experienced ongoing delays and denials that were not justified by the project's merits, consistent with a pattern of discrimination by Government Officials against the Plaintiffs.

IV.F.8.    During said last meeting in August 2025, Co-Defendant MR. RICHARD PÉREZ, Permits Technician mentioned that if they insist too much on what is alleged in the present Verified Complaint, they will deny and cancel the current construction permit of the Plaintiffs here and order the demolition.

IV.F.9.    The threat by Co-Defendant MR. RICHARD PÉREZ, Permits Technician to revoke permits and order demolition in retaliation for the Plaintiffs' Verified Complaint implicates multiple constitutional protections, including due process, free speech rights, equal protection, and protection from uncompensated

takings. Such conduct is unlawful and actionable, requiring judicial intervention to preserve the constitutional rights of the Plaintiffs.

## V.    DAMAGES

V.1. The Plaintiffs have suffered significant continuous and ongoing damages as a direct result of the obstruction by the MUNICIPALITY OF CABO ROJO and the COMMONWEALTH OF PUERTO RICO'S PLANNING BOARD, as well as the Co-Defendants named above in their personal and official capacities, since acquiring the property in 2017, the Plaintiffs have diligently maintained compliance with all tax and cadastral requirements, ensuring that their property was in full accordance with the applicable legal standards. Despite these efforts, the Plaintiffs have been unjustly prevented from pursuing multiple development projects, including a proposed emergency room facility, due to the erroneous classification of their property as lying within an agricultural zone. This classification is in stark contrast to the property's designation as Selective Development since 2010, a fact that the MUNICIPALITY OF CABO ROJO and the COMMONWEALTH OF PUERTO RICO'S PLANNING BOARD, as well as the Co-Defendants named above in their personal and official capacities, have consistently ignored in its dealings with the Plaintiffs.

V.2.   In particular, the individual Co-Defendants, acting within their personal capacities, have exhibited willful disregard and negligence by endorsing or failing to correct the misclassification despite clear evidence to the contrary and repeated notifications by the Plaintiffs. This active personal participation and omission have directly caused the prolonged denial of Plaintiffs' lawful property rights and opportunities. Such personal conduct by these individuals constitutes a breach of their duties and responsibilities, and has inflicted additional harm beyond institutional failings, including reputational damage, emotional distress, and lost business goodwill on the Plaintiffs, all aggravating the compensable injuries resulting from the obstruction.

V.3.   Between 2018 and 2019, the Plaintiffs submitted several location inquiries for development, all of which were denied based on the COMMONWEALTH OF PUERTO RICO PLANNING BOARD's incorrect classification of the property. Furthermore, a formal request for a zoning change was denied in January 2020, further compounding the Plaintiffs' inability to utilize their property as intended. These denials have not only thwarted the Plaintiffs' development plans but have also resulted in substantial financial losses, totaling $5.5 million. The Plaintiffs have been deprived of the opportunity to generate revenue from their proposed projects, and the obstruction has caused significant delays and

increased costs, all of which contribute to the continuing damages they have suffered.

V.4. The Co-Defendants in their personal capacities bear direct responsibility for these continuing damages, as their individual decisions, approvals, and advice were instrumental in sustaining the erroneous classification and denial of legitimate requests. Their personal acts of commission and omission have exacerbated the harm by prolonging Plaintiffs' inability to develop the land, resulting in foregone profits, sunk costs in planning and regulatory compliance, increased carrying costs, and lost opportunities to serve the community via the proposed emergency room facility. The Plaintiffs have also suffered intangible damages including business disruption, loss of investor confidence, and ongoing uncertainty affecting their ability to engage in alternative ventures, all attributable to the personal misconduct and negligence of the Co-Defendants named herein.

## VI.    INJUNCTIVE RELIEF SOUGHT

VI.1. In light of the ongoing and unjust obstruction by the COMMONWEALTH OF PUERTO RICO PLANNING BOARD and the MUNICIPALITY OF CABO ROJO, the Plaintiffs seek injunctive relief to prevent further harm and to enable the lawful development of their property.

VI.2.  The need for injunctive relief arises from the immediate and irreparable harm threatened against the Plaintiffs by Co-Defendant MR. RICHARD PÉREZ, Permits Technician, as verbally stated during the meeting in August 2025, as well as to the intentional actions and omissions of the other named Co-Defendants. MR. RICHARD PÉREZ'S unequivocal threat to deny and cancel the Plaintiffs' current construction permit and order demolition if they persist in pursuing the Verified Complaint necessitates urgent judicial intervention, for the following reasons:

## 1.    Imminent and Irreparable Harm

VI.3.    Co-Defendants' cancellation of a valid construction permit coupled with the direct threat forced demolition of Plaintiffs' property would cause immediate, irreparable harm that cannot be adequately remedied by monetary damages. The loss of property rights, the potential destruction of an ongoing project, and the profound disruption to Plaintiffs' rights and investments are harms that are both severe and irreversible.

## 2.  Violation of Constitutional Rights

VI.4.    Co-Defendants' threat constitutes retaliation in response to Plaintiffs exercising their constitutional rights, including their due process rights, free speech, and right to petition the government. These protected rights require protection from government actions motivated by retaliatory animus. Without injunctive relief,

Plaintiffs face the risk of unconstitutional actions that would violate fundamental liberties.

### 3.    Likelihood of Success on the Merits

VI.5.    Given the nature of Co-Defendant MR. RICHARD PÉREZ'S (Permits Technician) direct admission that permit cancellation and demolition are contingent on Plaintiffs' insistence on their claims in the Verified Complaint, Plaintiffs have a strong likelihood of success in proving that such governmental conduct is unlawful retaliation and denies procedural and substantive constitutional protections.

### 4.   Balance of Equities Favors Injunction

VI.6.    Preventing unlawful revocation of permits and demolition preserves Plaintiffs' property and constitutional rights. In contrast, the Government suffers no substantial hardship by maintaining the *status quo* pending resolution of the merits. The balance of hardships thus favors the Plaintiffs.

### 5.   Public Interest Supports Enforcement of Constitutional Protections

VI.7.    Enjoining retaliatory governmental conduct serves the public interest by upholding constitutional guarantees, protecting property rights, and ensuring that citizens can seek redress without fear of reprisal.

VI.8.      Given the immediate threat to Plaintiffs' construction permits and property, the clear risk of irreparable harm, and the violation of vital Constitutional rights, this Honorable Court should grant injunctive relief to preserve the *status quo*, prevent retaliation, and safeguard Plaintiffs' fundamental liberties until a final adjudication on the merits can be rendered, and also to issue a permanent injunction requiring Defendants to reclassify the property in accordance with its actual use and characteristics.

VI.9.  Furthermore, the Plaintiffs request that this Honorable Court issue an injunction compelling the COMMONWEALTH OF PUERTO RICO PLANNING BOARD and the MUNICIPALITY OF CABO ROJO to recognize the property's commercial classification, and to cease any further actions that would impede the Plaintiffs' development projects.

VI.10.      This relief is necessary to rectify the discriminatory treatment and biased enforcement that the Plaintiffs have faced, as evidenced by multiple meetings and inspections where they were subjected to unequal procedural treatment compared to other property owners.

VI.11.      The Plaintiffs also seek an injunction to prevent the COMMONWEALTH OF PUERTO RICO PLANNING BOARD and the MUNICIPALITY OF CABO ROJO from enforcing the erroneous agricultural

classification, which has been used as a pretext to deny the Plaintiffs' development

applications.

VI.12.      By granting this injunctive relief, this Honorable Court will

ensure that the Plaintiffs can proceed with their development plans without further

unlawful interference, thereby mitigating the ongoing damages and allowing the

Plaintiffs to realize the full potential of their property.

VI.13.      The injunctive relief sought is essential to restore the Plaintiffs'

rights and to prevent further financial and developmental harm.

## VII.   CLAIMS FOR RELIEF

### COUNT I:
### Violation Of First Amendment By Retailation For Executing Free Speech
### (42U.S.C. §1983)

### 1.     Protected First Amendment Activity

VII.1.    Plaintiffs incorporate by reference the allegations contained in the

preceding paragraphs as if fully set forth herein.

VII.2.     The conduct of Co-Defendant MR. RICHARD PÉREZ, Permits

Technician, together with the pattern of unjustified delays and denials experienced

and suffered by Plaintiffs by the other Co-Defendants in their personal and official

capacities, constitutes an explicit violation of the Plaintiffs' First Amendment rights

against government retaliation based on protected speech and petitioning activities.

Plaintiffs engaged in constitutionally protected activity by requesting their zoning re-classification, and now by filing the Verified Complaint, which is an exercise of their right to petition the government for redress of grievances. The First Amendment safeguards not only free speech but also the right to access the courts and administrative remedies without fear of retaliation.

### 2.    Adverse Government Action

VII.3.    The threatened denial and cancellation of a currently valid construction permit, coupled with the order for demolition, constitute adverse actions that would materially and negatively affect the Plaintiffs' property and their ability to proceed with their lawful construction project.  Ongoing unjustified delays and denials further show tangible governmental reprisals against the Plaintiffs.

### 3.    Causal Connection - Retaliation Motivated by Protected Activity

VII.4.    Co-Defendant MR. RICHARD PÉREZ'S explicit statement that these adverse actions will occur if Plaintiffs "insist too much" on the Verified Complaint, as well as the other intentional actions and omissions by the other Co-Defendants in their personal and official capacities, directly links the permit revocation and demolition threats to Plaintiffs' protected legal claims. This reveals a clear motive to punish Plaintiffs for exercising their First Amendment rights, establishing a retaliatory animus.

### 4.    Retaliation Violates the First Amendment

VII.5.    It is well-established that government officials may not retaliate against individuals for exercising their First Amendment rights by threatening or taking adverse actions that would deter such exercise.  The use of Government power—specifically permit approvals and property regulation—as a weapon to suppress Plaintiffs' petitioning activity is constitutionally impermissible. Retaliatory denial of permits and demolition orders aimed at chilling Plaintiffs' legal challenge represents unconstitutional Government coercion.

### 5.    Consequences and Need for Judicial Relief

VII.6.    Without judicial intervention, Plaintiffs face the risk of severe constitutional injuries: deprivation of property rights without due process and suppression of speech and petition rights through retaliatory threats.  The ongoing pattern of discriminatory delays and denials further demonstrates systemic retaliation, warranting immediate protection of Plaintiffs under the First Amendment.

VII.7.    The threats and actions taken by Co-Defendant MR. RICHARD PÉREZ and related named Co-Defendants in their personal and official capacities constitute a textbook case of First Amendment retaliation. They unlawfully seek to punish Plaintiffs for asserting their rights through the Verified Complaint by using

governmental power to deny permits and order demolition. Such conduct violates the core principles of free speech and the right to petition guaranteed by the First Amendment, thus demanding prompt judicial remedy.

## COUNT III
### Violation of Equal Protection (42 U.S.C. § 1983)

VII.8.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

VII.9.     Co-Defendants, acting under color of state law, have deprived Plaintiffs of their right to equal protection under the Fourteenth Amendment by arbitrarily and discriminatorily enforcing zoning and permitting standards against them, while allowing similar developments on adjacent properties.

## COUNT IV:
### Violation of Due Process (42 U.S.C. § 1983)

VII.10.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

VII.11.     Co-Defendants have deprived Plaintiffs of their property rights without due process of law by refusing to process development or permits based on an erroneous agricultural classification, despite evidence to the contrary.

## COUNT V
### (Class of One Constitutional Violations)

VII.12.        Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

VII.13.        Co-Defendants have engaged in arbitrary and discriminatory conduct, constituting a "Class of One" violation, by depriving Plaintiffs of their property rights without due process of law. This was done by refusing to process development applications or permits based on an erroneous agricultural classification, despite clear and compelling evidence to the contrary. This conduct lacks any rational basis and has resulted in unequal treatment of the Plaintiffs compared to similarly situated property owners.

## COUNT VI
### Violation of the Puerto Rico Civil Code
### Supplementary Jurisdiction:

VII.14.        This Court has supplementary jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as these claims are so related to the federal claims that they form part of the same case or controversy.

VII.15.        Continuous and Regular Damages: Plaintiffs allege that the Co-Defendants' actions have caused continuous and regular damages, including but not limited to economic losses, emotional distress, and reputational harm. These damages are actionable under the Puerto Rico Civil Code.

VII.16.      Co-Defendants are liable for their  actions, omissions, and/or negligence; and also, they are liable for the acts, omissions and/or negligence of their employees and/or agents, pursuant to Articles 1536 and 1540 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 10801, § 10805. This was the adequate and/or proximate cause of Plaintiffs' damages. Also, Co-Defendants were liable for their own negligence, acts and/or omissions, and for the negligence, acts and/or omissions of their employees, agents or subcontractors, under the *respondent superior* doctrine. The breach of all of the above duties by co-defendants was the adequate and/or proximate cause for Plaintiffs' damages.

VII.17. Relief Sought: Plaintiffs seek compensatory damages for the continuous and regular harm suffered, as well as any other damages to deter future misconduct by the Co-Defendants.

## COUNT VII
### Attorneys' Fees Under 42 U.S.C. Section 1988:

VII.18. Plaintiffs seek attorneys' fees pursuant to 42 U.S.C. § 1988, as they have been compelled to retain legal counsel to vindicate their constitutional rights due to the Co-Defendants' actions.

## VIII.  DEMAND FOR JURY TRIAL

VIII.1.      Plaintiffs demand a trial by jury on all issues so triable.

**VERIFIED COMPLAINT**                                                    36
Dolly E. Lugo Martínez, et al. v.  Commonwealth of Puerto Rico Planning Board, et al.
Civil No. 25-1529 (____)

## IX.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

IX.A. Declare that Defendants' actions violate Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution;

IX.B. Issue an injunction requiring Defendants to reclassify the property in accordance with its actual use and characteristics;

IX.C. Award Plaintiffs damages in the amount of $5 million for the deprivation of their constitutional rights;

IX.D. Award Plaintiffs their reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

IX.E. Grant such other and further relief as the Court deems just and proper.

### NOTICE OF ELECTRONIC FILING/CERTIFICATE OF SERVICE

**IT IS HEREBY CERTIED** that on this same date we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 1st day of  October 2025.

**VERIFIED COMPLAINT**                                                    37
Dolly E. Lugo Martínez, et al. v. Commonwealth of Puerto Rico Planning Board, et al.
Civil No. 25-1529 (____)



**VALENZUELA-ALVARADO, LLC**
MCS Plaza
255 Ponce de León Avenue
Suite 825, Hato Rey San Juan
Puerto Rico 00917-1942
Tel. (787) 756-4053
Fax: (787) 705-7415
www.valenzuelalaw.net

S/José Enrico Valenzuela-Alvarado

**JOSÉ ENRICO VALENZUELA-ALVARADO**
U.S.D.C.-P.R. 220104
Emails:
jeva@valenzuelalaw.net
jose.enrico.valenzuela1@gmail.com

**VERIFIED COMPLAINT**
Dolly E. Lugo Martínez, et al. v. Commonwealth of Puerto Rico Planning Board, et al.
Civil No. 25- (    )

Case 3:25-cv-01529-ADC    Document 1    Filed 10/01/25    Page 38 of 159

23

## STATEMENT UNDER PENALTY OF PERJURY
## UNDER 28 U.S.C. § 1746

We, Mr. Jesús Malavé-Soto and Ms. Dolly E. Lugo-Martínez, hereby declare under penalty of perjury, pursuant to the laws of the Commonwealth of Puerto Rico, that the following is true and correct to the best of our knowledge, information, and belief:

We are the plaintiffs in the Verified Complaint filed against officials in the Municipality of Cabo Rojo, both in their personal and official capacities, as well as the Commonwealth of Puerto Rico's Planning Board.

We have reviewed the Verified Complaint and affirm that the factual statements contained therein are true and correct to the best of our knowledge, information, and belief.

We understand that this statement is made under penalty of perjury, and we acknowledge the legal consequences of providing false information in this declaration.      OCTOBER

Executed on this _1 day of September, 2025.

_____
Mr. Jesús Malavé-Soto

_____
Ms. Dolly E. Lugo-Martínez

**EXHIBIT I**

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisals & Consultants*
*Condado Moderno Dev./B-6, 1ˢᵗ Street*
*Caguas, Puerto Rico 00725*
*PO Box 1181/Caguas, PR 00726-1181*

*APPRAISAL REPORT*
*OF*

*PR State Road 100, KM 14.0*
*Boquerón Ward*
*Cabo Rojo, PR 00623*

# Commercial Building



*PREPARED BY:*
*MILTON FLORES, MIE CREA*
*Professional Real Estate Appraiser, #706EPA*
*General Certified Appraiser, No. 162GC*

*PREPARED FOR:*
*Ms. Erika Salgado Sanabria*
*Credit & Service Supervisor*
*MediCoop*
*PO Box 194450*
*San Juan, PR 00919-4450*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*


March 20, 2025


Ms. Erika Salgado Sanabria
Credit & Service Supervisor
MediCoop
PO Box 194450
San Juan, PR 00919-4450

Dear Ms. Salgado Sanabria:

In accordance with your request, I hereby submit an Appraisal Report of a one level commercial site improved with a one-story four-unit commercial building located at PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico. The subject property owner is Dr. Dolly Lugo Martínez.

The purpose of this appraisal is to estimate the market value of the fee simple estate of the property, assuming it to be available for sale in the open market and subject to the assumptions and limiting conditions expressed forward in the body of the report, which are integral part of the market value reported in this letter. The client and intended user of this report is Ms. Erika Salgado Sanabria/MediCoop. The intended use of this appraisal report is to assist in a refinance process for MediCoop.

The improvements consist of one level commercial lot improved with a one-story four-unit commercial building. Overall, the interior design and finishes are considered typical. The actual condition of the improvements was at a good functional capacity and the continuation of commercial use is possible. The improvements were built in 2024 with average quality materials and were in good condition.

The site enjoys adequate frontage, access, and exposure. It lies within a Commercial (AR-1) zoning category, mainly commercial uses are allowed by the Planning Board and Cabo Rojo Municipality. The Flood map FEMA #72000C1545J indicates the subject site is located at minimum flood risk area.

The value estimate as reported herein reflects the value of the property "As Is" assuming that the subject property will be sold in a fair market value today. The property right value was considered as Fee Simple.


*P.O. Box 1181/Caguas, PR 00726-1181*          *E-Mail: miltonflorescsp@yahoo.com*
*Phone: (787) 743-8383*                                          *Fax: (787) 743-2514*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*Fee Simple Interest is defined as an absolute fee, free of limitations to any particular class of heirs or restrictions, but subject to the limitations of eminent domain, escheat, police power, and taxation.*

***Value "As Is"*** *means the value of specific ownership rights to an identified parcel of real estate as of the effective date of the appraisal; relates to what physically exists and is legally permissible and excludes all assumptions concerning hypothetical market conditions or possible rezoning.*

***Market Value*** *is defined as the estimated amount at which the appraised property might be expected to exchange between a willing buyer and a willing seller, neither being under compulsion, each having reasonable knowledge of all relevant facts, with equity to both.*

The subject property was valued as if offered in the open market for a reasonable time in which to find a buyer. I assumed the property would be available for use to its highest and best use, free and clear of all liens and encumbrances. The property was personally inspected, and the following factors were considered in forming my opinion of value:

a.    Location, size, and utility of the land
b.    Highest and Best Use of the land and the land & improvements
c.    Prevailing real estate market conditions and relative desirability of the property in the marketplace

The value estimated is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for such conditions or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired. The following appraisal report contains information considered relevant data of the subject property and methods to estimate the market value of the subject.

The following is an appraisal report in a narrative format, which presents information considered relevant to the fee simple estate in these properties and the methods by which collected data has been analyzed in arriving at my value conclusion. The report, in its entirety, including all assumptions and limiting conditions, is an integral and inseparable part of this letter.

The value estimates as reported herein reflect the market value of the property "As Is" assuming that the subject property will be sold at a fair market value today. The function of the appraisal is to assist in a refinance process at MediCoop.

*P.O. Box 1181/Caguas, PR 00726-1181*          *E-Mail: miltonflorescsp@yahoo.com*
*Phone: (787) 743-8383*                                    *Fax: (787) 743-2514*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

The report is for the sole use of the client (s) regarding the intended use. The appraiser is not required to testify or explain as to appraisal result other than to respond to the client for routine and customary questions.

The value estimate indicated in this report is based on market data and conditions as of the appraisal date, which is projected to remain stable. Any substantial changes in market conditions could have a favorable or unfavorable influence on the real estate value.  I accept no responsibility regarding future changes in the market that could not be anticipated as of the effective date of the appraisal report.  The appraiser is not responsible for the unauthorized use of this report.

The report consists of this letter, which identifies the property appraised; describes the nature and scope of my appraisal, and states the conclusion of value, a narrative report containing a description of the property, a discussion of the valuation procedures, the conclusions, and exhibits.

After inspection of the physical and financial aspects of the subject property, their legal documents, and after analyzing the factors affecting value in the subject area, it is my opinion that the market value of the fee simple estate of the subject property as of **February 22, 2025,** was rounded to:

### *"As Is"*
### *THREE MILLION AND FIVE HUNDRED THOUSAND DOLLARS*
### *($3,500,000.00)*

I hereby certify that I have no present or contemplated financial interest in the subject property and that my employment and compensation are in no way contingent upon the values reported, or upon the sale of the subject property.

Milton Flores
MIE, CREA, Lic. #706EPA
General Certified Appraiser #162GC

*P.O. Box 1181/Caguas, PR 00726-1181*          *E-Mail:  miltonflorescsp@yahoo.com*
*Phone: (787) 743-8383*                                                    *Fax: (787) 743-2514*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

### *TABLE OF CONTENTS*

*Certificate of the Appraiser*..................................................................................... *1*

*SUMMARY OF SALIENT FACTS AND CONCLUSIONS*....................................... *2*

*General Assumptions and Limiting Conditions*.................................................. *6*

*Definitions* ................................................................................................................ *8*

*Identification and Description of Real Estate*...................................................... *10*

*Owner* ...................................................................................................................... *10*

*Census Tract Number* ........................................................................................... *11*

*Flood Insurance Rate Map* .................................................................................... *12*

*Property Taxes and Assessments*......................................................................... *15*

*Scope of the Appraisal Process*............................................................................ *17*

*Property Rights Appraised* .................................................................................... *19*

*Personal Property*................................................................................................... *19*

*Purpose and Intended Use* .................................................................................... *19*

*Intended User* .......................................................................................................... *19*

*Legal Description* .................................................................................................... *20*

*Market Value*........................................................................................................... *22*

*Effective Date of Appraisal*................................................................................... *23*

*Date of Report* ........................................................................................................ *23*

*Extraordinary Assumptions*.................................................................................. *23*

*Hypothetical Condition* ......................................................................................... *23*

*Competency Provision*........................................................................................... *24*

*Sales History of Subject Property*........................................................................ *26*

*Marketing Time and Exposure Time* ................................................................... *27*

*The Island of Puerto Rico*..................................................................................... *31*

*Economy of Puerto Rico* ....................................................................................... *43*

*Cabo Rojo Municipality*......................................................................................... *64*

*P.O. Box 1181/Caguas, PR 00726-1181*          *E-Mail:  miltonflorescsp@yahoo.com*
*Phone: (787) 743-8383*                                              *Fax: (787) 743-2514*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*Neighborhood Analysis* ...................................................................................... *72*

*Neighborhood Description* .................................................................................. *73*

*Site Overview* ...................................................................................................... *75*

*Competition Study* .............................................................................................. *76*

*Subject Improvements* ........................................................................................ *76*

*Zoning* .................................................................................................................. *86*

*Topography* .......................................................................................................... *86*

*Soil Survey* ........................................................................................................... *87*

*Environmental Condition* ................................................................................... *89*

*Hazardous Substances* ........................................................................................ *89*

*Utilities and Services* .......................................................................................... *89*

*Easements, expropriations and encroachments* ................................................ *89*

*Conclusion of Site Analysis* ............................................................................... *89*

*Highest and Best Use* .......................................................................................... *90*

*Methods of Valuation* ......................................................................................... *95*

*The Market Sales Comparison Approach* .......................................................... *96*

*Market Comparisons* ........................................................................................... *96*

*The Cost Approach* .............................................................................................. *97*

*COMPARABLE VACANT LAND SALES SUMMARY* ...................................... *102*

*MARSHALL VALUATION SERVICE* ................................................................. *108*

*Subject Improvements Value "As Is"* ............................................................... *109*

*Curable Physical Depreciation* ......................................................................... *110*

*Summary and Conclusions of Cost Approach* .................................................. *111*

*The Income Approach* ....................................................................................... *112*

*Reconciliation and Value Conclusions* ............................................................ *113*

*Curriculum Vitae* .............................................................................................. *115*

*P.O. Box 1181/Caguas, PR 00726-1181*          *E-Mail:  miltonflorescsp@yahoo.com*
*Phone: (787) 743-8383*                                              *Fax: (787) 743-2514*

*Milton Flores y Asociados, C.S.P.*                                                      *1*
*Real Estate Appraisers & Consultants*

## Certificate of the Appraiser

I certify that, to the best of my knowledge and belief.

- The statements of facts contained in this report are true and correct.
- The reported analyzes, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and is my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
- I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.
- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*.
- I have made a personal inspection of the property that is the subject of this report.
- No one provided significant real property appraisal assistance to the person signing this certification.
- No prior appraisal report has been made by Milton Flores Appraising Firm.
- The effective date of the appraisal is February 22, 2025.

Milton Flores
MIE, CREA, Lic. #706EPA
General Certified Appraiser #162GC

*P.O. Box 1181/Caguas, PR 00726-1181*                                  *E-Mail: miltonflorescsp@yahoo.com*
*Phone: (787) 743-8383*                                                             *Fax: (787) 743-2514*

*Milton Flores y Asociados, C.S.P.*                                                    *2*
*Real Estate Appraisers & Consultants*

# SUMMARY OF SALIENT FACTS AND CONCLUSIONS

| | |
|---|---|
| **The subject property** | The fee simple estate of one commercial level site of approximately 13.3 cuerdas improved with a one-story commercial building located at PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico. The subject property owner is Dr. Dolly Lugo Martínez. |
| **Owner of the record** | Dr. Dolly Lugo Martínez |
| **Location** | PR State Road 100, KM 14.0, Boquerón Ward Cabo Rojo, PR 00623 |
| **Property Identification Number** | 356-000-008-86-000 |
| **GPS Coordinates** | Lat: 18.02949059, Lon: -67.16027629 |
| **Purpose of the Appraisal** | To estimate the market value in fee simple of the subject property as of February 22, 2025. |
| **Intended Use** | To estimate the market value of the property to assist on a refinance process for MediCoop. |
| **Intended Users** | MediCoop |
| **Report Format** | Appraisal Report Format |
| **USPAP Compliance** | As per the Uniform Standards of Professional Appraisal Practice (USPAP), this report complies with all requisites of USPAP, and the laws and regulations of the United States of America and the Commonwealth of Puerto Rico. |
| **Neighborhood** | The property lies in a suburban neighborhood of Cabo Rojo Municipality. It is adjacent to PR State Roads 100 and 101 with typical infrastructure and amenities adequate to support most uses. |
| **Site Area** | 13.3 cuerdas |

*Milton Flores y Asociados, C.S.P.*                                    *3*
*Real Estate Appraisers & Consultants*

**Property Rights Appraised**        The fee simple interest

**Zoning**                           Agrícola en Reserva Uno (AR-1)

**Shape**                            Irregular

**Topography**                       Level

**Flood Insurance Map Zone**         #72000C1545J Zone "X"

**Hazardous Substances**             Unless otherwise stated in this report, the existence of hazardous materials, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation and other potentially hazardous materials may affect the value of the property. The value estimated is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for such conditions or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

**Access**                           Adequate, frontage to PR State Road 100

**Frontage**                         More than 190.0 feet off PR State Road 100

**Exposure**                         Adequate to PR State Road 100

**Soils**                            During the site analysis and field inspection, any soils studies were available. Nevertheless, the appraisers estimate based on the type of construction next to the subject property, that this soil could be used for most suburban uses including agricultural uses and structures. The appraiser is not responsible for hidden conditions that might exist.

*P.O. Box 1181/Caguas, PR 00726-1181*                    *E-Mail: miltonflorescsp@yahoo.com*
*Phone: (787) 743-8383*                                        *Fax: (787) 743-2514*

*Milton Flores y Asociados, C.S.P.*                                                   **4**
*Real Estate Appraisers & Consultants*

| | |
|---|---|
| **Highest and Best Use** | As if Vacant: Commercial |
| | As Improved: Commercial |

**Improvements** — The subject property refers to a one-story four-unit commercial building built on a 13.3 cuerdas lot. It is located at PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico. The building's net area of 5,640 square feet is distributed into four units plus two corridors. Reportedly, the property was extensively renovated and converted as a commercial building. The overall building is built with reinforced concrete and concrete blocks and is in good physical condition. Interior finishes improvements include ceramic tiles, plastered and painted concrete walls, fluorescent lights, security doors and windows plus independent water pumping system. Additional improvements and systems included paved areas at the front and rear sides. The parking facilities include approximately eighty (80) stalls with a parking ratio of 14.18:1,000 SF.

**Building Summary**

| | |
|---|---|
| **Gross Building Area** | 5,640.0 square feet |
| **Building Class** | Commercial: Class B Good Cost |
| **Parking Ratio** | 80 stalls/ 14.18:1,000 SF |
| **Average Height** | 9.0 to 12.0 feet |
| **Condition** | Good |
| **Land to Building Ratio** | 99.77:1 |
| **Floor Area Ratio** | 1.00% |
| **Date of Value Estimate** | February 22, 2025 |
| **Extraordinary Assumption** | The subject property is conforming to the adjacent properties. No extraordinary assumptions were made. |

*P.O. Box 1181/Caguas, PR 00726-1181*                    *E-Mail: miltonflorescsp@yahoo.com*
*Phone: (787) 743-8383*                                                        *Fax: (787) 743-2514*

*Milton Flores y Asociados, C.S.P.*                                                        5
*Real Estate Appraisers & Consultants*

**Hypothetical Condition**          No hypothetical conditions were made.

**Estimated Exposure Time**         36 months

**Estimated Marketing Time**        24 months

**Value Indication by:**

**Sales Comparison Approach**       $1,795,500.00
**Cost Approach**                   $3,500,000.00
**Income Approach**                 Not Developed

**Final Estimate of Value**         **$3,500,000.00**

**Appraiser**                       Milton Flores
                                    MIE, CREA, LIC. #706EPA
                                    General Certified Appraiser #162GC

*Milton Flores y Asociados, C.S.P.*                                                                                    *6*
*Real Estate Appraisers & Consultants*

## General Assumptions and Limiting Conditions

This appraisal report has been made with the following general assumptions:

1.      No responsibility is assumed for the legal description provided or for matters pertaining to legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated.

2.      The property is appraised free and clear of any all liens or encumbrances unless otherwise stated.

3.      Responsible ownership and competent property management are assumed.

4.      The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

5.      All engineering studies are assumed to be correct. The plot plans and illustrative material in this report are included only to help the reader visualize the property.

6.      It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for obtaining the engineering studies that may be required to discover them.

7.      It is assumed that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated, described, and considered in the appraisal report.

8.      It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless a non conformity has been identified, described and considered in the appraisal report.

9.      It is assumed that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

10.     It is assumed that the use of the land and improvements is confines within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

11.     The availability of capacity and/or connection rights to any or public utilities has not been determined by the appraiser. The value estimate reported herein is contingent upon and limited to said capacity and right of connection.

12.     Unless otherwise stated in this report, the existence of hazardous materials, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation and other potentially hazardous materials may affect the value of the property. The value estimated is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for such conditions or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

13.     Any allocation of the total value estimated in this report between the land and the improvements applies only under the stated program of utilization. The separate values allocated to the land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

14.     Possession of this report, or a copy thereof, does not carry with it the right of publication. The appraiser, by reason of this appraisal, is not required to give further consultation or testimony or to be in attendance in court with reference to the property in question unless arrangements have been previously made.

15.     Neither all nor any part of the contents of this report, especially any conclusion as to value, the identity of the appraiser, or the firm with which the appraiser is connected, shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent and approval of the appraiser.

16.     Any value estimate provided in the report apply to the entire property, ad any prorating or division of the total into fractional interests will invalidate the value estimate, unless such prorating or division of interest has been set forth in the report.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                                7
*Real Estate Appraisers & Consultants*

17.     The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term   supply demand factors, and continued stable economy.  These forecasts are, therefore, subject to changes with future conditions.

18.     The appraisers will not be required to give testimony or appear in court because of having made this appraisal, with reference to the properties in question, unless arrangements have been previously made thereof.

19.     Any cause of action resulting between the appraisers and the client in conjunction with this appraisal, either directly or indirectly, will be limited in damages to the amount of the appraisal fee received for the assignment.  Furthermore, it is agreed that the client will indemnify Milton Flores y Asociados, C.S.P., for any damages, costs, expense, and attorney's fees resulting from any cause of action by any interested party, other than the client, concerning the appraisal or report.

20.     In the case where an improvement is considered, the distribution of the total valuation between land and improvements applies only under the reported highest and best use of the property.  The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used

21.     Disclosure of the contents of this report is governed by the By-Laws and Regulations of the Appraisal Institute.  Neither all nor any part of the contents of this report, or copy thereof, shall be conveyed to the public through advertising public relations, news, sales or any other media without written consent and approval of the appraisers.  Nor shall the appraisers, firm or professional organization of which the appraisers are a member be identified without prior written consent of the appraisers.

22.     The physical condition of the improvements described herein is based on visual inspection only.  No liability is assumed for the soundness of structural members including roof (wear and leakage), footings, exterior and interior walls, partitions, floors, or any other part of the structure, since no engineering test were made of same and no termite inspection was conducted.  Furthermore, the appraisers accept no legal responsibility for the efficiency of the plumbing and electrical systems, the heating and air conditioning equipment, or any major appliances.  Unless otherwise noted, all of these items appeared adequate and operational.

23.     The American with Disabilities Act (ADA) became effective January 26, 1992.  We have not made a specific compliance survey or analysis of this property to determine whether or not it is in conformity with the various detailed requirements property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act.  If so, this fact could have a negative impact upon the value of the property.  Since we have no direct evidence relating to this issue, we did not consider possible non-compliance with the requirements of ADA in estimating the value of the property.

24.     The appraisal report was written as a Restricted Appraisal Report; A written report prepared under Standards Rule 2-2(c) of an Appraisal performed under Standard 1.

Milton Flores
MIE, CREA, Lic. #706EPA
General Certified Appraiser #162GC

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*    8
*Real Estate Appraisers & Consultants*

# Definitions

Various terms are used throughout the appraisal report.  The following are definitions of the terms:

1. ADVOCACY – Representing the cause or interest of another, even if that cause or interest does not necessarily coincide with one's own beliefs, opinions, conclusions, or recommendations.

2. APPRAISAL – (noun) The act or process of developing an opinion of value; an opinion of value.  (Adjective) of or pertaining to appraising and related functions such as appraisal practice or appraisal services.

3. APPRAISAL CONSULTING –The act or process of developing an analysis, recommendation, or opinion to solve a problem, where an opinion of value is a component of the analysis leading to the assignment results.

4. APPRAISAL FOUNDATION – The Appraisal Foundation incorporated as an Illinois not for Profit Corporation on November 30, 1987.

5. APPRAISAL PRACTICE – Valuation services performed by an individual acting as an appraiser, including but not limited to appraisal, appraisal review, or appraisal consulting.

6. APPRAISER – One who is expected to perform valuation services competently and in a manner that is independent, impartial, and objective.

7. APPRAISER PEERS – Other appraisers who have expertise and competency in the same or a similar type of assignment.

8. APPRECIATION – Increase in value due to increase in cost to reproduce, value over the cost, or value at some specified earlier point in time brought about by greater demand, improved economic conditions, increasing price levels, reversal of depreciating environmental trends, improved transportation facilities, direction of community or area growth, or other factors.

9. ASSIGNMENT – A valuation service provided as a consequence of an agreement between an appraiser and a client.

10. ASSIGNMENT RESULTS – An appraiser's opinions and conclusions developed specific to an assignment.

11. ASSUMPTION – that which is taken to be true.

12. BIAS – A preference or inclination that precluded an appraiser's impartiality, independence, or objectivity in an assignment.

13. BUSINESS ENTERPRISE – An entity pursuing an economic activity.

14. CLIENT – The party or parties who engage an appraiser (by employment or contract) in a specific assignment.

15. CONFIDENTIAL INFORMATION – Information that is either: Identified by the client as confidential when providing it to an appraiser and that is not available from any other source; or

    - Classified as confidential or private by applicable law or regulation.

16. COST – The amount required to create, produce, or obtain a property

17. DEPRECIATION – A loss of utility and hence value from any cause.  An effect caused by physical deterioration and/or obsolescence.

18. ECONOMIC OBSOLESCENCE – Impairment of desirability of useful life arising from factors external to the property, such as economic forces or environmental changes which affect supply-demand relationships in the market.  Loss in the use and value of a property arising from the factors of economic obsolescence is to be distinguished from loss in value from physical deterioration and functional obsolescence, both of which are inherent in the property.  Also referred to as Location or Environmental Obsolescence.

19. EXTRAORDINARY ASSUMPTION – an assumption directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinion or conclusions.

20. FEASIBILITY ANALYSIS – A study of the cost-benefit relationship of an economic endeavor.

21. FUNCTIONAL OBSOLESCENCE – Impairment of functional capacity or efficiency.  Functional obsolescence reflects the loss in value brought about by such factors as overcapacity, inadequacy, and changes in the art that affect the property item itself or its relation with other elements comprising a larger property. The inability of a structure to perform adequately the function for which it is currently employed.

22. HIGHEST AND BEST USE – That reasonable and probable use that will support the highest present value, as defined, as of the effective date of the appraisal.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                                                          **9**
*Real Estate Appraisers & Consultants*

23. HYPOTHETICAL CONDITION – That which is contrary to what exists but is supposed for the purpose of analysis.

24. INTANGIBLE PROPERTY (INTANGIBLE ASSETS) – Nonphysical assets, including but not limited to franchises, trademarks, patents, copyrights, goodwill, equities, securities, and contracts as distinguished from physical assets such as facilities and equipment.

25. INTENDED USE – The use or uses of an appraiser's reported appraisal, appraisal review, or appraisal consulting assignment opinions and conclusions, as identified by the appraiser based on communication with the client at the time of the assignment.

26. INTENDED USER – The client and any other party as identified, by name or type, as users of the appraisal, appraisal review, or appraisal consulting report by the appraiser on the basis of communication with the client at the time of the assignment.

27. JURISDICTIONAL EXCEPTION – An assignment condition that voids the force of a part or parts of USPAP, when compliance with part or parts of USPAP is contrary to law or public policy applicable to the assignment.

28. MARKET PRICE – The amount actually paid, or to be paid, for a property in a particular transaction differs from market value in that it is an accomplished or historic fact, whereas market value is and remains an estimate until proven. Market price involves no assumption of prudent conduct by the parties, absence of undue stimulus, or any other condition basic to the market value concept.

29. MARKET VALUE – A type of value, stated as an opinion, that presumes the transfer of property (i.e., a right of ownership or a bundle of such rights), as of a certain date, under specific conditions set forth in the definition of the term identified by the appraiser as applicable in an appraisal.

30. PERSONAL PROPERTY – Identifiable tangible objects that are considered by the general public as being "personal" – for example, furnishings, artwork, antiques, gems and jewelry, collectibles, machinery and equipment; all tangible property that is not classified as real estate.

31. PRESENT VALUE - The current monetary value. It is today's cash lump sum, which represents the current value of the right to collect future payments. It is the discounted value of aggregate future payments.

32. PRICE – The amount asked, offered, or paid for property.

33. REPORT – Any communication, written or oral, of an appraisal, appraisal review, or appraisal consulting service that is transmitted to the client upon completion of an assignment.

34. SCOPE OF WORK – The amount and type of information researched, and the analysis applied in an assignment. Scope of work includes, but is not limited to, the following:

- The degree to which the property is inspected or identified.

- The extent of research into physical or economic factors that could affect property.

- The extent of data research; and

- The type and extent of analysis applied to arrive at opinions or conclusions.

35. SIGNATURE – Personalized evidence indicating authentication of the work performed by the appraiser and the acceptance of the responsibility for content, analyses, and conclusions in the report.

36. SUPPLEMENTAL STANDARDS – Requirements issued by government agencies, government sponsored enterprises, or other entities that establish public policy which add to the purpose, intent and content of the requirements in USPAP, that have a material effect on the development and reporting of assignment results.

37. VALUE – The monetary relationship between properties and those who buy, sell, or use those properties.

38. VALUATION PROCESS – Services pertaining to aspects of property value.

39. WORKFILE – Documentation necessary to support an appraiser's analysis, opinions, and conclusions.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

## Identification and Description of Real Estate

The subject property refers to a one-story commercial building built on a 13.3 cuerdas level commercial site. It is located at PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico. The building's net area of 5,640 square feet is distributed into four units plus two corridors. Reportedly, the property was extensively renovated and converted into a commercial building facility.

The overall building is built of reinforced concrete and concrete blocks and is in good physical condition. Interior finishes improvements include ceramic tiles, plastered and painted concrete walls, fluorescent lights, security doors and windows plus independent water pumping system. Additional improvements and systems included paved areas at the front and rear sides. The parking facilities include approximately 80 stalls with a parking ratio of 14.18:1,000 square feet.

The subject property was personally inspected several times during this engagement. During and after this time, a detailed study of the various real estate markets was made.  In forming my opinion of the highest and best use of the land and improvements and its value indications, consideration has been given to the present state of the economy; past, present, and future market trends; the supply of and demand; and the overall pattern of development in the area.

## Owner

The actual owner is Dr. Dolly Lugo Martínez. Therefore, they have an absolute and complete right of ownership over the subject property for an unlimited duration of time with an unconditional right of disposition and use.

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*11*

## Census Tract Number

The Census Tract Map of 2025 for Cabo Rojo Town (023) of Puerto Rico (72) indicates that the subject property is located at Census Tract number #8306.05.



| | |
|---|---|
| **MSA/MD Code** | **32420** |
| **State Code** | 72 |
| **County Code** | 023 |
| **Tract Code** | 8306.05 |
| **MSA/MD Name** | MAYAGÜEZ, PR |
| **State Name** | PUERTO RICO |
| **County Name** | CABO ROJO MUNICIPIO |

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

## Flood Insurance Rate Map

Property damage can be caused by the elements of fire, air, water, and earth.  This can result from windstorms, floods, and earthquakes, although a basic real property insurance policy may cover only fire or fire and windstorms, excluding water and earthquake damage.  In some locations, this additional coverage can be obtained by paying extra premiums and obtaining endorsements to the policy.

Until 1968, flood insurance was not offered by most insurance companies, It was felt that only those high-risk areas would be interesting, which would cause the rates to be very high. Then, a joint effort of the insurance industry and the federal government resulted in the National Flood Insurance Program.

As an encouragement to purchase flood insurance, the federal government subsidizes rates and reinsures companies against catastrophic losses.  At the same time, the federal government tries to discourage further construction in flood prone sites.  Therefore, before flood insurance can be sold in an area, the community must enact and enforce restrictions against further construction in locations subject to flooding.

The Federal Emergency Management Agency (FEMA) issues maps showing Special Flood Hazards Areas (SFHAs).  Federally regulated lending institutions must require flood insurance on mortgages on properties located in a SFHA.  Such areas could be better explained as follows:



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*13*

## Definitions of FEMA Flood Zone Designations

Flood zones are geographic areas that the FEMA has defined according to varying levels of flood risk.  These zones are depicted on a community's Flood Insurance Rate Map (FIRM) or Flood Hazard Boundary Map.  Each zone reflects the severity or type of flooding in the area.

### Moderate to Low-Risk Areas

**In communities that participate in the NFIP, flood insurance is available to all property owners and renters in these zones:**

| ZONE | DESCRIPTION |
|------|-------------|
| B, C, and X | Areas outside the 1-percent annual chance floodplain, areas of 1% annual chance sheet flow flooding where average depths are less than 1 foot, areas of 1% annual chance stream flooding where the contributing drainage area is less than 1 square mile, or areas protected from the 1% annual chance flood by levees. No Base Flood Elevations or depths are shown within this zone. Insurance purchase is not required in these zones. |

### High Risk Areas

**In communities that participate in the NFIP, mandatory flood insurance purchase requirements apply to all of these zones:**

| ZONE | DESCRIPTION |
|------|-------------|
| A | Areas with a 1% annual chance of flooding and a 26% chance of flooding over the life of a 30-year mortgage. Because detailed analyses are not performed for such areas; no depths or base flood elevations are shown within these zones. |
| AE, A1-A30 | Areas with a 1% annual chance of flooding and a 26% chance of flooding over the life of a 30-year mortgage. In most instances, base flood elevations derived from detailed analyses are shown at selected intervals within these zones. |
| AH | Areas with a 1% annual chance of shallow flooding, usually in the form of a pond, with an average depth ranging from 1 to 3 feet. These areas have a 26% chance of flooding over the life of a 30-year mortgage. Base flood elevations derived from detailed analyses are shown at selected intervals within these zones. |
| AO | River or stream flood hazard areas and areas with a 1% or greater chance of shallow flooding each year, usually in the form of sheet flow, with an average depth ranging from 1 to 3 feet. These areas have a 26% chance of flooding over the life of a 30-year mortgage. Average flood depths derived from detailed analyses are shown within these zones. |
| AR | Areas with a temporarily increased flood risk due to the building or restoration of a flood control system (such as a levee or a dam). Mandatory flood insurance purchase requirements will apply, but rates will not exceed the rates for unnumbered A zones if the structure is built or restored in compliance with Zone AR floodplain management regulations. |

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*          *14*
*Real Estate Appraisers & Consultants*

| | |
|---|---|
| **A99** | Areas with a 1% annual chance of flooding will be protected by a federal flood control system where construction has reached specified legal requirements. No depths or base flood elevations are shown within these zones. |

## High Risk - Coastal Areas

**In communities that participate in the NFIP, mandatory flood insurance purchase requirements apply to all of these zones:**

| ZONE | DESCRIPTION |
|---|---|
| **V** | Coastal areas with a 1% or greater chance of flooding and an additional hazard associated with storm waves. These areas have a 26% chance of flooding over the life of a 30-year mortgage. No base flood elevations are shown within these zones. |
| **VE, V1 - 30** | Coastal areas with a 1% or greater chance of flooding and an additional hazard associated with storm waves. These areas have a 26% chance of flooding over the life of a 30-year mortgage. Base flood elevations derived from detailed analyses are shown at selected intervals within these zones. |

## Undetermined Risk Areas

| ZONE | DESCRIPTION |
|---|---|
| **D** | Areas with possible but undetermined flood hazards. No flood hazard analysis has been conducted. Flood insurance rates are commensurate with the uncertainty of the flood risk. |

*The subject property is located at Zone "X" by the Flood Insurance Rate Map #72000C1545J, revised on November 18, 2009.  This classification means that the site is identified as a minimum flood risk area.*

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                            *15*
*Real Estate Appraisers & Consultants*

## Property Taxes and Assessments

Tax laws in Puerto Rico are like tax laws in the mainland.  Like in United States, Puerto Rico's tax rates are based in two separate rates.   One is determined by the Commonwealth government and the second one determined by the municipality where the subject property is located.  The subject property is in **Cabo Rojo Municipality.**

The assessment value is based on estimated market value that were prevalent during the 1957-58 period, when the last general assessment of all properties on the island was made this condition has caused a difference between the assessment value of a property and the actual market value, therefore the government is unable of collecting the real amount in taxes over the assessment value of properties.

The Commonwealth collects returns three percent of the property taxes to the municipalities where the property is located and approximately another one percent goes to the treasury department to pay the debt service.

**Cabo Rojo Municipality** has an **overall tax rate of 10.08%**.  PR tax law provides for a 10% discount on the property taxes if paid within 60 days before the due date and 5% if paid within 30 days before the due date. The property identification number for the subject property is 356-000-008-86-000.



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*16*



ESTADO LIBRE ASOCIADO DE PUERTO RICO
CENTRO DE RECAUDACIÓN DE INGRESOS MUNICIPALES

CERTIFICACIÓN DE VALOR / VALUE CERTIFICATE

Fecha de Impresión: 02/06/2025
Hora de Impresión: 8:19:57 AM

Numero de Certificación

WX2025026329947
Regular

**Información de la propiedad / Property Information**

| Número de Catastro / Parcel Number | | | | Localización de la Propiedad / Property Location |
|---|---|---|---|---|
| 356-000 | 008 | 86 | 000 | BO BOQUERON   CARR 307 KM.HM 14.0 |
| Mapa | Manzana | Parcela | Edificio | CABO ROJO |

2. Esta propiedad esta valorada de la siguiente manera: / The property is currently valued as follows:

| | |
|---|---|
| Tierra/Land | 1,751 |
| Estructura/Structures | 0 |
| Maquinaria/Machinery | 0 |
| Total Assessed Value | 1,751 |

3. Esta propiedad tiene una cabida de:
The property land size is :
13.30    C

4. A esta propiedad y/o a su dueño, se le concedió una exención contributiva de:    0

This property, and/or its current owner, has been granted a value exemption of :

5. A esta propiedad y/o a su dueño, se le concedió una exoneración contributiva de:    0

This propery, and/or its current owner, has been granted a value exoneration of :

6. Esta propiedad figura en el Certificado y Lista de Tasación a nombre de:

LUGO MARTINEZ DOLLY E

The current owner on the Tax Roll is:

LUGO MARTINEZ DOLLY E

| Fecha Emitida / Issued Date | Fecha Expiración / Expires Date | | Certificación Electrónica |
|---|---|---|---|
| 6-Feb-2025 | 6-May-2025 | | |

Nota aclaratoria: La información suministrada en esta certificación puede ser afectada por cualquier investigación de cuenta que se haya iniciado o esté por iniciarse a este contribuyente. Esta certificación tendrá una vigencia de 3 meses a partir de la fecha de emisión.

Note: The information submitted in this certificate can be affected by any investigation or intervention to the account. This Report will be valid for 3 months from the date of issue.

WX2025026329947
6-Feb-2025    08:19:57 AM

Validar certificado en portal.crim360.com/certificados

9947
Página 1 de 1

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                                     *17*
*Real Estate Appraisers & Consultants*

## Scope of the Appraisal Process

The purpose of this appraisal report is to estimate the market value of the fee simple estate of the property located at PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico as of the date of valuation.    This report will concern itself solely with the valuation of real estate, that is, the value of the commercial site. This assignment encompasses providing an "as is" market value of the fee simple interest in the property. In order to carry out this assignment, the appraisers were involved in several tasks. The first step in the valuation process is to develop a concise statement or definition of the appraisal assignment. This sets the limits of the appraisal assignment and eliminates any ambiguity about the nature of the assignment.  This is accomplished by:

a.  Identification of the problem to be solved was performed by identifying the Intended Use (to assist in a refinance process) and the client (MediCoop) or any other Intended User of the appraisal, identifying any Hypothetical Condition and Extraordinary Assumption present as part of the assignment, and setting the Limiting Conditions to be able to produce credible results.

b.  Pertinent data about address, assessor's parcel number, lease contract and appraisal request were asked to the client.

c.  The subject property was last inspected as of February 22, 2025.

d.  Information regarding neighborhood economic trends was analyzed.

e.  Physical inspection was made including interior and exterior surveys (measurements, photographs)

f.  The highest and best use analysis was calculated "As Though Vacant" and "As Improved"

g.  The three approaches to value have been considered in arriving at an opinion of value of the fee simple interest in the subject property. Only the sales comparison and the cost approach were developed for the conclusion of market value.

h.  In the sales comparison approach a thorough search was made, after considering location, date of sales, physical differences etc. the appraiser selected three comparable sales, which are the best indication of the value of the subject property.  Such comparables were verified by legal deed and confirmed with buyers and sellers, assessor's office, public registry office, and well-known comparable sales services companies.

i.  The replacement cost was estimated using well-known cost services and verified with local builder's figures. The age life method to estimate accrued depreciation was applied and allocated between physical, functional, and external types of depreciation. Physical depreciation, curable and functional depreciation were accounted for in this case; the subject is in good condition, yet it contains sufficient building area and conforms to building codes and the permit office requirements.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                **18**
*Real Estate Appraisers & Consultants*

j.  The subject property is designed for commercial use building; this type of property is usually bought for owner use. The subject land is located within a commercial/residential neighborhood, and its value does not lie in its income-producing ability. Therefore, the income approach to value has no application to this appraisal problem.

k.  In reconciliation, I considered the quantity and quality of the data available under each approach, the advantages and/or disadvantages of each approach, and the relevance of each to the subject property and to the appraisal problem.

l.  A certification was signed.

After defining and accepting the assignment, the preliminary analysis, which was previously formulated in order to determine the character and extent of the proposed assignment, is reviewed and refined. The preliminary analysis also determines the amount of work that will be required to gather the necessary data for the appraisal. These analysis and work plan are dependent upon the character and extent of the assignment and the type of property being valued. The next step is to make a physical inspection of the subject property and its environs, including the gathering of general and specific data as it relates to the property.

General data consists of information on the principles, forces and factors that affect property value. This information includes regional and neighborhood trends, as well as social, economic, governmental and environmental forces that could or may have an effect on value. This general data contributes significantly to the understanding of the marketplace.

The subject site was visually inspected to determine its topographic characteristic, and to ascertain its shape, drainage condition and overall functional utility. Specific data relates to the property being appraised, including a detailed description of both the parcel comprising the subject site and the subject's existing and/or proposed building and site improvements; as well as current and recent changes in ownership of the subject, occupancy, zoning and land use regulations affecting the subject, and assessment and real estate tax information applicable to the subject. The gathering of specific data also relates, as may be applicable, to the comparable land sales, improved sales and rents selected, which are also inspected and verified. In addition to the physical data, also gathered and analyzed are location, cost and/or income (including leases) and expense information on both the subject and, as available, on the comparable sales and/or rentals utilized. Also considered are financing arrangements and/or unusual motivations of either buyer or seller that could or did affect selling prices or rentals.

An integral part of the valuation process for the property is the determination of the highest and best use of the subject site: 1) as if vacant and 2) as currently improved. The latter analysis is useful in identifying comparable properties, and determining whether the existing improvements should be retained, renovated or demolished. For example, the land value estimate, as if vacant, is required when the land's contribution to total property value is sought, or when improvements are valued separately, as in the Cost Approach.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                              *19*
*Real Estate Appraisers & Consultants*

After determining the highest and best use, and gathering the general and specific data, we integrate the information drawn from the market research and analysis of data and consider the application of the three valuation approaches the Income Capitalization Approach, the Sales Comparison Approach and the Cost Approach to derive a well-supported value estimate. Since the three approaches are interrelated, the purpose and function of the assignment, and the property type and use all assist in determining which three of the scenarios which we considered to be most likely approach or approaches are most appropriate. In our case only sales comparison and the cost approach method of valuation were developed for value conclusion.

## Property Rights Appraised

The property rights appraised for the subject property is a freehold estate. **Fee simple estate** is a *fee without limitations to any class of heirs or restrictions, but subject to the limitations of eminent domain, police power and taxation. It is the absolute ownership of real property.* It gives the owner and his heirs unconditional power of disposition and other rights.

## Personal Property

Personal property was excluded in the appraisal report, as well as business inventory at the time of field inspection.

## Purpose and Intended Use

The purpose of this appraisal is to estimate the market value of the subject property. The appraisers understand the intended use of this appraisal is to assist in a refinance procedure.

## Intended User

The intended user is MediCoop, their internal management, their auditor and appropriate regulatory authorities. It may not be distributed to or relied upon by other people or entities without the appraiser's written permission.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*20*

## Legal Description

Legal descriptions are used in contracts and deeds that convey real property from one person to another.  It is necessary that any parcel of real property be unquestionably differentiated from any other piece and the exact boundaries determined.  Any lapse of time must not interfere with this ability to be able clearly define the property and any improvements on it. If one person owns a parcel of property for thirty or forty years, many things can change during that time.  Street and road names may be changed, or neighboring properties may change ownership.  If it is raw land, it may be subdivided, or pieces sold from the main parcel. Houses can be torn down and replaced by apartments, or other factors may make the simple street address insufficient to identify the property clearly.

The legal description for real property provides this positive legal identification and the means to identify the exact same parcel later. Several methods are available to ensure the identification of land so that there is no question as to the property involved or its exact boundaries.  The technical capabilities of land surveyors and the accuracy of their instruments are necessary to enable these exacting methods.

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*21*

establecidos en el Artículo 17(c) de la Ley Notarial de Puerto Rico, específicamente mediante su licencia de conducir expedida por el Estado Libre Asociado de Puerto Rico, la cual contiene su foto y firma, a saber: licencia número uno ocho dos tres uno cero siete (1823107). Por las manifestaciones de los comparecientes de la Primera y Segunda Parte, que juzgo ciertas, doy fe también de su edad, estado civil, profesión y vecindad. Los comparecientes me aseguran tener, y a mi juicio tienen, la capacidad legal necesaria para este formal otorgamiento, sin que nada me conste en contrario, y en tal virtud, libre y voluntariamente--------------------

------------------------------EXPONEN------------------------------

---PRIMERO: Que el Vendedor es dueño en pleno dominio del inmueble descrito a continuación (en adelante, la "Propiedad"):--------------------

-----"RÚSTICA: Parcela de terreno radicada en el Barrio Boquerón del término municipal de Cabo Rojo, Puerto Rico, con una cabida superficial mensurada de cincuenta y dos mil doscientos setenta y cuatro punto treinta y dos (52,274.32) metros cuadrados, equivalentes a trece punto treinta (13.30) cuerdas. En lindes por el NORTE, con terrenos de Erick Morales Rosas; por el SUR, con terrenos de Erick Morales Rosas, con la Quebrada Boquerón que la separa de terrenos de Reynaldo Morales Rosas y Carretera Estatal número ciento uno (101); por el ESTE, con terrenos de Erick Morales Rosas; y por el OESTE, con Carretera Estatal número cien (100).--------------------

-----Mensura realizada por el Agrimensor Frank Lozada Díaz, licencia número cinco mil setecientos ochenta y siete (5787). La descrita finca es el resultado de una mensura, según escritura número cuarenta y cuatro (44), otorgada en Cabo Rojo, Puerto Rico, el día ocho (8) de octubre de dos mil siete (2007), ante el Notario Público Fernando Luís Sepúlveda Silva, inscrita al folio ciento cuarenta y nueve (149) del tomo novecientos cuarenta (940) de Cabo Rojo, finca número tres mil ochocientos treinta y tres (3,833), inscripción sexta (6ta)."--------------------

---La Propiedad consta inscrita al folio ciento cincuenta y uno (151) del tomo ciento dieciocho (118) de Cabo Rojo, finca número tres mil ochocientos treinta y tres (3,833), Registro de la Propiedad de Puerto Rico, Sección de San Germán. --------------------

---A la fecha de la transacción aquí efectuada, la Propiedad no ha sido segregada ni tasada para fines contributivos por el Centro de Recaudación de Ingresos Municipales (en adelante, "CRIM"), por lo que forma parte de la finca identificada con el número de catastro tres cinco seis guion cero cero cero guion cero cero ocho guion siete dos guion nueve cero uno

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*22*

## Market Value

Most appraisal assignments are estimations of market value. **Market value** has no universal definition but is closely related to the buying, selling, or exchanging of property. The various courts and jurisdictions around the country have produced many different definitions, each with their own assumptions and limitations. Many definitions of market value are based on a decision by the California Supreme Court in an eminent domain case (Sacramento Railroad Company v. Heilbron). According to the court, market value is:

*The highest price in terms of money which a property will bring in a competitive and open market under all condition's requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus.*

The fourteen edition of The Appraisal of Real Estate, published by the Appraisal Institute, defines market value as:

*The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.*

The assumptions and conditions presumed in the institute's definitions include the following: The property is exposed for a reasonable time on the open market. The determination of a "reasonable" period of time depends on the type of property and the existing market conditions. For instance, residential properties usually sell more quickly than do commercial or industrial properties, and all properties tend to sell at a slower rate when mortgage rates are high.

1.    Buyers and sellers are well informed and act prudently.
2.    Buyers and sellers act in their own best interests.
3.    Payment is made in cash, its equivalent, or in other specific terms.
4.    The specified financing, if any, may be the financing already in place or readily available financing.
5.    The impact, if any, on the market value of any atypical financing or other concessions must be indicated in the appraisal report.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                    *23*
*Real Estate Appraisers & Consultants*

## Effective Date of Appraisal

February 22, 2025

## Date of Report

March 20, 2025

## Extraordinary Assumptions

It is an assumption directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as facts that are otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data in an analysis. The subject property conforms to the adjacent properties, no extraordinary assumptions were made.

## Hypothetical Condition

It is that which is contrary to what exists but is supposed for the purpose analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. No hypothetical conditions were observed.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

## Competency Provision

**Competence** is a standardized requirement for an individual to properly perform a specific job. It encompasses a combination of knowledge, skills and behavior utilized to improve performance. More generally, competence is the state or quality of being adequately or well qualified, having the ability to perform a specific role.

A person possesses competency if the skills, abilities, and knowledge that constitute that competence are a part of them, enabling the person to perform effective action within a certain workplace environment. Therefore, one might not lose knowledge, a skill, or an ability, but still lose competence if what is needed to do a job well changes.

Prior to accepting an assignment or entering into an agreement to perform any assignment, an appraiser must properly identify the problem to be addressed and have the knowledge and experience to complete the assignment competently; or alternatively:

1. disclose the lack of knowledge and/or experience to the client before accepting the assignment; and
2. take all steps necessary or appropriate to complete the assignment competently; and
3. describe the lack of knowledge and/or experience and the steps taken to complete the assignment competently in the report.

As one of the most prominent real estate appraisal firms in the Caguas area, Milton Flores y Asociados, C.S.P., has consistently been called on to provide expert appraisal services for the region's most noteworthy properties, including Agricultural and Farm related properties. For over 50 years, Milton Flores y Asociados, C.S.P. has built its reputation as an industry leader through dedication to intensive research and thorough analysis. Our appraisers hold the General Certified Appraiser designation and our affiliation with appraisal data services provides us with the most current market information available. In turn, we provide our clients with the most accurate, most efficient analysis.

A full range of appraisal services including consulting, narrative appraisal reports, feasibility studies, highest and best use studies, form appraisal reports, and court testimony are offered by the office. Milton Flores y Asociados, C.S.P. provided comprehensive and seamless due diligence services for individual properties and portfolios. With offices in Caguas, we take pride in providing a consistent service of thorough, accurate analysis throughout the nation. Our assignments have involved a wide variety of property types nationwide.

*Milton Flores y Asociados, C.S.P.*                                                              *25*
*Real Estate Appraisers & Consultants*

The office produced Appraisal Reports in accordance with the requirements of government agencies, lenders, courts, The Appraisal Foundation, and The Appraisal Institute under the Uniform Standards of Professional Appraisal Practice (USPAP).  We supply form reports with the FHLMC, FNMA, and CRIIMI MAE formats for residential lenders, in compliance with government standards. Narrative reports for banks are made in accordance with FIRREA. Preparations suitable for presentation of our opinions and analyses in court are part of many assignments.   Milton Flores is a certified general appraiser with more than ten years' experience as licensed real estate appraiser.  The past years he has been involved in market studies, feasibility studies and appraisals. As the office's principal he takes on valuation and consultation assignments in Caguas Central Area and as well in other areas of Puerto Rico including Vieques and Culebra. Milton Flores holds an MBA from The University of Connecticut with a Real Estate major and at present is a professor at the University of Puerto Rico; Río Piedras Campus, teaching real estate and economics courses. Mr. Milton Flores has been appraising all types of real property for public institutions and private clients since 1994. He has qualified in various Courts as an expert real estate appraisal witness. He is also a member of many real estate appraisal and real estate related organizations.

Office, industrial, commercial, residential, institutional related properties throughout the Puerto Rico the eastern area for other clients including but not limited to:

·        Lot 125 Barcelona Street, Santurce Ward, San Juan, PR
·        Apt. 4 Querubín Parras Cond., #242 Franklin D. Roosevelt Ave., San Juan, PR
·        26-1 Winston Churchill Ave. corner José Zorrillas St., El Señorial Dev., San Juan, PR

This opinion of value is based on an inspection of the subject property; a study of the commercial use property related properties markets; a study of sales, offerings, and rentals of similar properties; as well as other factors pertinent to value.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                                                   *26*
*Real Estate Appraisers & Consultants*

## Sales History of Subject Property

USPAP Standards Rules 1-5(a) and (b) require an appraiser, when the value opinion to be developed is market value, and if such information is available to the appraiser in the normal course of business, to analyze:

    a.    all agreements of sale, options, or listings of the subject property current as of the effective date of the appraisal and

    b.    all sales of the subject property that occurred within three (3) years prior to the effective date of the appraisal.

USPAP Standards Rules 2-2(a) (viii), (b) (viii), and (c) (viii) call for the written appraisal report to contain sufficient information to indicate compliance with the sales history requirement. Standards Rules 2-2(a)(viii), (b)(viii), and (c)(viii) further require that, if sales history information is unobtainable, the written appraisal report must include a commentary on the efforts taken by the appraiser to obtain the information.

Research into the applicable public records, private data services and an interview with the current owner revealed that the subject property owner acquired the subject property on March 12, 2018, for $145,000.00. No prior appraisal report has been made by this appraiser firm.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                                                          *27*
*Real Estate Appraisers & Consultants*

## Marketing Time and Exposure Time

**Exposure Time**

The time a property remains on the market.  The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based upon an analysis of past events assuming a competitive and open market. Exposure time is always presumed to occur prior to the effective date of the appraisal.  The overall concept of reasonable exposure encompasses not only adequate, sufficient, and reasonable time but also adequate, sufficient and reasonable effort.  Exposure time is different for various types of real estate and value ranges and under various market conditions.

Statement 6 (SMT-6) of USPAP defines exposure time as follows:

 "The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective opinion based on an analysis of past events assuming a competitive and open market."

The obligation for appraisers to develop an opinion of exposure time for real property and personal property assignments appears in the Comment to Standards Rules 1-2(c) and 7-2(c) where it states:

 "When the purpose of an assignment is to develop an opinion of market value, the appraiser must also develop an opinion of reasonable exposure time linked to the value opinion."

The requirement for appraisers to communicate or report exposure time is later addressed in the Comment to Standards Rule 2-2(a) (v) and (b) (v). The footnote referring to Statement 6 (SMT-6) explains exposure time should be reported as follows:

 "The discussion of reasonable exposure time should appear in an appropriate section of the appraisal report, one that presents the discussion and analysis of market conditions and also be referenced at the statement of the value definition and at the value conclusion."

Disclosing exposure time is as important to most market value opinions as disclosing the term component (n) of a time value of money equation. In effect, the appraiser is telling the intended user(s),  "In order for your real property interest to have a market value of X on the effective date of this appraisal, it would have been exposed for Y days (or weeks, months, etc.) on the open market."

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                                    *28*
*Real Estate Appraisers & Consultants*

Bear in mind that there is no requirement that exposure time must be stated as a specific amount.  Thus, it may be expressed as a range, (i.e. 30-90 days, 3-6 months, etc.)

Since real property and personal property rights are, to varying degrees, non-homogenous and ill liquid, it is important for the intended user to be informed of the exposure period inherent within the concluded market value opinion. Exposure time is different for various types of property and under various market conditions.

Statement 6 (SMT-6) explains exposure time can be based on one or more of the following:

# Statistical information about days on market.
# Information gathered through sales verification; and
# Interviews of market participants.

Most private and some public comparable sale data sources include information about days on the market providing an appraiser with valuable data for analysis. It is also usually easy to discuss events leading to the eventual sale of a property interest with those parties involved when verifying sale data.

Interviews with local market participants such as real estate commercial brokers and real estate appraiser actively involved in the immediate area indicated in their opinion a reasonable period to market a comparable industrial property if priced reasonably will be in a range of 24 to 36 months at actual economic condition and market expectations.  The appraiser estimated an exposure time of approximately 36 months for the subject property.

**Marketing Time**

The time it takes an interest in real property to sell on the market subsequent to the date of an appraisal. Reasonable marketing time is an estimate of the amount of time it might take to sell an interest in real property at its estimated market value during the period immediately after the effective date of the appraisal; the anticipated time required to expose the property to a pool of prospective purchasers and to allow appropriate time for negotiation, the exercise of due diligence, and the consummation of a sale at a price supportable by concurrent market conditions. Marketing time differs from exposure time, which is always presumed to precede the effective date of the appraisal. (Advisory Opinion 7 (AO-7) of the Appraisal Standards Board of the Appraisal Foundation and Statement on Appraisal Standards No.6 "Reasonable Exposure Time in Real Property and Personal Property Market Value Opinions" address the determination of a reasonable exposure and marketing time). The development of marketing time opinion uses some of the same data analyzed in the process of developing a reasonable exposure time opinion, these are:

·       Statistical information about days in the market,
·       Information gathered through sales verification,
·       Interviews of market participants, and.
·       Anticipated changes in the market conditions.

In contrast to exposure time, an opinion of marketing time is not required by USPAP, though it may be required through supplemental standards. For instance, the Fannie Mae Single Family Selling Guide, Part XI: Property and Appraisal Guidelines states that when marketing time is greater than six months, the appraiser must comment on the reason for the extended marketing period and its effect on the value of the property. Marketing time can be based on one or more of the same elements used in determining the opinion of exposure time with the addition of one component: anticipated changes in market conditions. Anticipated changes in market conditions account for fluctuations in the cost and availability of funds, materials, labor, as well as other supply and demand characteristics. Marketing time is not intended to be a prediction of a date of sale, and it may be inappropriate to assume that market value remains stable during the marketing period.

Under "FIRREA", the appraisers are required to estimate the marketing time for the real property being appraised. This marketing time estimate represents our estimate of the length of time necessary to sell a property interest in real estate at the estimated market level during the period immediately after the effective date of the appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. Marketing time is the future price based on current known and expected characteristics of the property, its environs, and the real estate market existing during that period.

*Milton Flores y Asociados, C.S.P.*                                                    *30*
*Real Estate Appraisers & Consultants*

The ultimate future price that may be achieved at the conclusion of the marketing period may or may not equal the appraised value on the earlier valuation date, depending on potential changes during the marketing period in the physical real estate, demographic and economic trends, the real estate market, and tenancy and property operations, among other factors.

A reasonable marketing time is a function of price, time, and anticipated market conditions such as changes in the cost and availability of funds, not an isolated estimate of time alone. Our estimate of marketing time was based on one or more of the following:

·        Information gathered through sales verification.
·        Interviews of market participants and review of investor-surveys and.
·        Anticipated changes in the market conditions.

Market value estimates imply that an adequate marketing effort and reasonable time for exposure occurred prior to the effective date of the appraisal. In the case of disposition value, the time frame allowed for marketing the property rights is somewhat limited, but the marketing effort is orderly and adequate. With liquidation value, the time frame for marketing the property rights is so severely limited that an adequate marketing program cannot be implemented.

As stated above conversation with commercial real estate brokers and fellow appraisers in the area indicates after considering past, present and expected economic conditions a reasonable marketing time for a comparable industrial property is estimated to be 18 months to 24 months. Moreover, the real estate brokers for the comparable sale indicate a marketing period for the comparables of approximately 24 months.  Thus, the marketing time for the subject property was estimated to be 24 months.

**Conclusion of exposure time and marketing time:**

In summary, appraisers are obligated to develop and report an opinion of exposure time; but not marketing time unless required by a supplemental standard or by agreement with a client. Exposure time exists before the effective date of the appraisal, whereas marketing time exists immediately after the effective date. While exposure time and marketing time are garnered through similar sources and many times yield like results, their distinct meanings and implications should carefully be considered by appraisers and users of their services.  Based on the research, the appraiser concludes that for the subject property a reasonable exposure time, assuming the property is professionally and actively marketed, would be 36 months.  The marketing time was estimated to be 24 months.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

## The Island of Puerto Rico

Puerto Rico, freely associated commonwealth of the United States, composed of one large island and several small islands. Officially the Commonwealth of Puerto Rico (Spanish, Estado Libre Asociado de Puerto Rico), Puerto Rico is bordered on the north by the Atlantic Ocean; on the east by the Virgin Passage (which separates it from the Virgin Islands); on the south by the Caribbean Sea; and on the west by the Mona Passage (which separates it from the Dominican Republic).

Puerto Rico became a US commonwealth on July 25, 1952. It was claimed by the explorer Christopher Columbus in 1493 and was subsequently a Spanish possession before the United States gained control in 1898. Its name, Spanish for "rich port", was first applied to its capital, known as San Juan Bautista de Puerto Rico in the 16th century. Gradually, the city came to be called San Juan and the island Puerto Rico. The name formerly was spelled Porto Rico. Puerto Rico is sometimes called the "Island of Enchantment". Its major cities are San Juan (the capital as well as the largest city), Bayamón, Carolina, Ponce, Caguas, and Mayagüez.

With an area of 9,104 sq km (3,515 sq mi), Puerto Rico is one of the larger islands of the West Indies, and the commonwealth also includes several small islands, such as Culebra, Mona, and Vieques. It is located about 1,610 km (1,000 mi) south-east of Florida and is almost twice as far from the mainland of North America as it is from South America. Puerto Rico is roughly rectangular in shape; its greatest east to west distance is about 180 km (110 mi), and its extreme north to south distance is about 65 km (40 mi). The highest point is Punta Peak at 1,338 m (4,389 ft). Its coastline measures some 501 km (311 mi).

Puerto Rico is mountainous. The Central Mountains form an east-to-west backbone that extends almost the entire length of the island. The average elevation of these mountains, which include the Cordillera Central and the Sierra de Luquillo, is about 915 m (3,000 ft). Although the mountains and adjacent foothills cover most of Puerto Rico, on the northern side of the island lays a coastal plain up to about 19 km (12 mi) wide, and a narrower coastal plain up to about 13 km (8 mi) wide extends along the southern coast. For most of its length the mountain system is nearer the southern coast than the northern coast, and the slopes are generally steeper on the southern side. At the eastern end of the island, however, the mountains curve towards the north-eastern corner.

Puerto Rico has many relatively short rivers and streams. Some of the rivers are dammed for hydroelectric power and thus have small lakes along their courses. One such body of water is Lago de Yauco, on the Yauco River. The longest river is the Grand de Arecibo, which flows to the northern coast. Other rivers include the Grand de Añasco, Bayamón, Cibuco, Culebrinas, and La Plata. None of the rivers is navigable by large vessels.

*Milton Flores y Asociados, C.S.P.*                                                          *32*
*Real Estate Appraisers & Consultants*

Puerto Rico is a mountainous, tropical island directly in the path of the trade winds. These conditions account for its tropical rainforest and tropical wet and dry climates. Except at night, in the highest areas, the air is always warm. There is little difference from season to season in the energy received from the Sun, and the length of the day remains constant throughout the year. In addition, the average temperature of the seawater surrounding the island is about 27 °C (81° F), with little variation during the year. Trade winds reaching Puerto Rico from the east blow over this warm water and carry the warmth over the land. The mean annual temperature at San Juan, in the north, is about 26° C (79° F); the recorded temperature in the commonwealth has ranged from 4.4° C (40° F) in 1911 at Aibonito to 39.4° C (103° F) in 1906 at San Lorenzo. Puerto Rico is sometimes struck by damaging hurricanes traveling from the east, especially from August to October.

Several thousand varieties of tropical plants grow in Puerto Rico, including the kapok tree, or Ceiba, with its thick trunk, the poinciana (a prickly tropical shrub with brilliant reddish blossoms), the breadfruit, and the coconut palm. A tropical rainforest in the north-eastern section of the island has tree ferns, orchids, and mahogany trees; part of this tropical area is included in the Caribbean National Forest. In the dry south-western corner of Puerto Rico are cactus and bunch grass.

Puerto Rico has no large wild mammals. The mongoose was brought into control rats on sugar cane plantations. Iguanas and many small lizards abound, and bats are present. The island has one animal found almost nowhere else in the world— the coquí, a small tree frog that produces a loud, clear "song" from the branches of trees at night. Barracuda, kingfish, mullet, Spanish mackerel, tuna, lobster, and oysters are among the many fish inhabiting coastal waters.

Puerto Rico's mineral deposits include limestone, glass sand, clay, copper, cobalt, chromium, nickel, iron ore, cement, gravel, stone, graphite, lime, salt, and peat. Coffee is the most valuable crop, followed by vegetables, sugar cane, bananas, pineapples, tobacco, and rice. Dairy products, poultry, and beef cattle and calves are also important sources of income.

Much of Puerto Rico's Forest cover had been cut by about 1900, and despite concerted efforts after 1935 to replant trees, the forest industry remains small. Commercial fishing also plays a minor role in the economy. Tuna species caught include yellow fin, skipjack, and blue fin. Small-scale freshwater fish farming is a growing economic activity; fish raised include bass, bluegill, and catfish.

Manufacturing activity has been encouraged by government incentives such as tax exemptions, loans, and research assistance. The island has benefited from the importing of capital, technology, and entrepreneurship from mainland United States.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                    *33*
*Real Estate Appraisers & Consultants*

Clothing is the leading manufacturing industry, followed by the production of electronic goods, processed food, and chemicals. Other major manufactured goods include pharmaceuticals, industrial machinery, printed materials, rubber and plastics, metal items, precision instruments, footwear, and alcoholic beverages.

According to the 1990 census, Puerto Rico had 3,522,037 inhabitants, an increase of about 10.2 per cent over 1980. The average population density in 1990 was 387 people per sq km (1,002 per sq mi), a much higher density than for any state except New Jersey and Rhode Island. The great majority of Puerto Rico's inhabitants are of Hispanic background; Spanish and English are the official languages and have been since 1902. In 1991 a law was passed making Spanish the sole official language, but in 1993 this was revoked. Spanish is by far the more widely known language, spoken by about 90 per cent of the population.

Puerto Rico's first free primary school was founded in the early 19th century in San Juan. By the late 1980s the commonwealth's state schools annually enrolled about 486,200 elementary pupils and about 165,000 secondary students.

The University of Puerto Rico (1903) is the oldest institution of higher education in Puerto Rico; it has branches in Arecibo, Bayamón, Cayey, Humacao, Mayagüez, Ponce, Río Piedras, and San Juan. In the late 1980s the commonwealth had a total of 55 institutions of higher education with a combined enrolment of about 153,000 students. Besides the University of Puerto Rico, these institutions included Bayamón Central University (1970), in Bayamón; Inter-American University of Puerto Rico (1912), with major campuses in Hato Rey and San Germán; Catholic University of Puerto Rico (1948), in Ponce; and the University of the Sacred Heart (1935), in Santurce.

Several Puerto Rico's major cultural institutions are in San Juan. These include the Museum of Puerto Rican Art; housing works from pre-Columbian times to the present; the Museum of Military and Naval History; and the Museum of Natural History. Of note, too, is the Ponce Art Museum, which has exhibits of paintings by European and Puerto Rican artists.

Puerto Rico's Spanish heritage is preserved in many sites in San Juan, especially in the insular part of the city known as Old San Juan. Among these sites are El Morro and San Cristóbal fortresses, both part of San Juan National Historic Site, La Fortaleza, once a fortress and now the governor's palace, its oldest section completed in 1540; Old Santo Domingo Convent, built between 1523 and 1528; and Fort San Geronimo (completed late 18th century).

Puerto Rico's mild climate and sandy beaches make it a popular recreation area, especially for swimming, fishing, boating, tennis, and golf. Both horse racing and cockfighting attract many spectators. Baseball, basketball, and boxing also are popular sports.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                     *34*
*Real Estate Appraisers & Consultants*

The Commonwealth of Puerto Rico is governed under the constitution of 1952, as amended. An amendment to the constitution may be proposed by the commonwealth's legislature or by a constitutional convention. To become effective an amendment must be approved by most people voting on an issue in an election. Puerto Ricans share most rights and obligations of other US citizens; residents of the commonwealth may not vote in US presidential elections, however, and, except for federal employees and members of the US armed forces, are not required to pay federal income taxes.

The chief executive of Puerto Rico is a governor, who is popularly elected to a four-year term and who may be re-elected any number of times. The secretary of state succeeds the governor should the latter resign, die, or be removed from office. The governor, with the consent of the legislature, appoints the heads of the commonwealth's executive departments.

Legislative authority is vested in a bicameral Legislative Assembly, made up of a senate and a house of representatives. In the early 1990s the senate had 27 members, and the house had 53 members. Legislators are popularly elected to four-year terms.

At a national level, Puerto Rico is represented by a non-voting resident delegate in the Congress of the United States. The delegate is elected by Puerto Ricans to a four-year term. In the early 1990s Puerto Rico's leading political parties were the Popular Democratic party (founded 1938), which advocates the maintenance of commonwealth status, and the New Progressive party (1967), which advocates that Puerto Rico becomes a US state. The small Puerto Rico Independence party (1946) favors independence for the island.

Christopher Columbus reached the island and claimed it for Spain on November 19, 1493. He named it San Juan Bautista. It became known as Puerto Rico after 1521, when the city of San Juan had been founded and given the island's original name.

Puerto Rico was conquered for Spain in 1509 by Juan Ponce de León, who became the first governor. The island was originally peopled by the Borinqueño, an agricultural people who were enslaved and largely exterminated as the result of harsh treatment. The Native Americans were replaced by black African slaves who worked the plantations and sugar mills.

Privateers and pirates harassed the island's residents during the early colonial years. The Spanish constructed strong fortifications and in 1595 defeated the English navigators Sir Francis Drake and Sir John Hawkins when they attempted to capture Puerto Rico; Hawkins was mortally wounded. Raids, however, continued for a long time. San Juan was burned during a Dutch attack in 1625, and the English sacked Arecibo in 1702.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                           *35*
*Real Estate Appraisers & Consultants*

Puerto Rico was opened to foreign trade in 1804, and in 1808 was accorded representation in the Spanish Parliament. Short-lived uprisings against Spanish rule occurred a few times during the 19th century, but all were quickly suppressed. Slavery was abolished in 1873. The island was granted autonomy in 1897. As a result of the Spanish-American War (1898), Puerto Rico was ceded to the United States by the Treaty of Paris (December 10, 1898). In 1900 the US Congress established a civil government on the island. US citizenship was granted to Puerto Ricans in 1917, and the United States instituted measures designed to solve various economic and social problems of the overpopulated island. From 1940 to 1948 a hydroelectric-power expansion programmed was instituted to attract US industry and to provide more employment for Puerto Ricans. Irrigation projects were also initiated. During World War II the island became a key US military base. Naval bases were constructed in San Juan harbor and on Culebra.

Under the leadership of Luis Muñoz Marín, head of the Popular Democratic Party, a development programmed known as Operation Bootstrap was launched in 1942, resulting in greatly increased manufacturing and a large rise in the general living standard. In 1948, Muñoz became the first elected governor of the island.

On June 4, 1951, Puerto Rican voters approved in a referendum a US law that granted them the right to draft their own constitution. The constituent assembly began its deliberations in the following September. In March 1952, the electorate approved the new constitution, and on July 25 Governor Muñoz proclaimed the Commonwealth of Puerto Rico. The commonwealth held its first general election under the new statute on November 4; Muñoz and the Popular Democratic Party received an overwhelming majority.

The re-election of Governor Muñoz in 1956 and 1960 was regarded as a popular endorsement not only of his economic and social policies but also of commonwealth status. In a July 1967 referendum, Puerto Ricans once more voted to remain a commonwealth.

In the election of 1968, Luis Alberto Ferré, candidate of the New Progressive party, was elected governor. He favored statehood for Puerto Rico, but not until the island's economy was stronger. In 1972 the Popular Democratic Party returned to power with Rafael Hernández Colón, a supporter of commonwealth status, as governor. The electorate shifted again in 1976, as the New Progressives regained control of the legislature and Carlos Romero Barceló was elected governor. Romero, a firm advocate of statehood, chose to play down the issue after the 1980 elections, in which he retained his office by only a narrow margin, and the Popular Democratic Party scored impressive victories in legislative and mayoral contests. Meanwhile, extreme nationalist groups such as the US-based Armed Forces of National Liberation (Fuerzas Armadas de Liberación Nacional, or FALN) used terrorist tactics in the late 1970s and early 1980s to press the cause of independence.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

In 1984 Hernández Colón won the governorship as his Popular Democratic party established commanding majorities in both legislative houses; he was re-elected in 1988. The legislature voted to make Spanish the official language of Puerto Rico. After losing a symbolic plebiscite on the commonwealth question in 1991, Hernández Colón decided not to run for another term. In 1992 Pedro Rosselló of the New Progressive party was elected governor on a pro-statehood platform. He pressed the issue in a 1993 plebiscite, but 48 per cent of the voters elected to petition the US Congress to retain the commonwealth, with enhanced status; 46 per cent chose statehood and 4 per cent chose independence.

In 1996 Rosselló was re-elected governor, obtaining 51 per cent of the vote. In December 1998, a referendum (the third) was held on joining the United States as the 51st state. The prospect was once more rejected, with over half the islanders voting to retain Puerto Rico's status as a commonwealth territory of the United States. In 2000, the newly elected governor of the island, Sila María Calderón, also committed herself to preserving its status. Calderón, of the Popular Democratic Party, became Puerto Rico's first woman governor.

In 2005, protests over the noise of bombing practice forced the closure of Roosevelt Roads Base. This resulted in a loss of 6,000 jobs and an annual decrease in income of $300 million. In 2006, Puerto Rico saw its credit rating downgraded to one notch above non-investment grade by the main credit rating agencies, with the possibility of more downgrades happening soon. This has led to fiscal measures to reduce government spending, increase revenues, and balance the budget, and the implementation in 2006 and expansion in 2013 of 7% sales taxes. Present-day Puerto Rico has become a major tourist destination and a leading pharmaceutical and manufacturing center, as well as a major financial center for the Caribbean.

In early 2017, the Puerto Rico debt crisis posed serious problems for the government which was saddled with outstanding bond debt that had climbed to $70 billion or $12,000 per capital at a time with a 45 percent poverty rate and 12.4% unemployment that is more than twice the mainland U.S. average. The debt had been increasing during a decade long recession.

The Commonwealth had been defaulting on many debts, including bonds, since 2015. "Without action before April, Puerto Rico's ability to execute contracts for Fiscal Year 2018 with its managed care organizations will be threatened, thereby putting at risk beginning July 1, 2017, the health care of up to 900,000 poor U.S. citizens living in Puerto Rico", according to a letter sent to Congress by the Secretary of the Treasury and the Secretary of Health and Human Services. They also said that "Congress must enact measures recommended by both Republicans and Democrats that fix Puerto Rico's inequitable health care financing structure and promote sustained economic growth."

Hurricanes Irma and María sharply reduced the availability of electricity throughout the island. Initially, the oversight board created under PROMESA called for Puerto Rico's governor Ricardo Rosselló to deliver a fiscal turnaround plan by January 28. Just before that deadline, the control board gave the Commonwealth government until February 28 to present a fiscal plan (including negotiations with creditors for restructuring debt) to solve the problems. A moratorium on lawsuits by debtors was extended to May 31. It is essential for Puerto Rico to reach restructuring deals to avoid a bankruptcy-like process under PROMESA.

In May 2018, after Puerto Rico's water system was massively damaged by Hurricane Maria, the Natural Resources Department, a non-profit international environmental advocacy group, reported that Puerto Rico's potable water system was the worst as measured by the Safe Drinking Water Act, with 70% of the population living with water that violated U.S. law.

In December 2019, cockfighting again became illegal in Puerto Rico. Governor Wanda Vázquez Garced asked for a reprieve stating the industry brings in $9 million each year and people employed in the industry would be left destitute. The island is still recovering from the devastation of 2017's Hurricane María, which killed about 3,000 people and destroyed a significant amount of infrastructure.

Puerto Rico is a political paradox: part of the United States but distinct from it, enjoying citizenship but lacking full political representation, and infused with its own brand of nationalism despite not being a sovereign state.

More than a century after being acquired by the United States from Spain, the island continues to grapple with its status as a U.S. territory and the legacy of colonialism in the Caribbean.

The debate over Puerto Rico's statehood remains as relevant as ever, as the island struggles with the combined effects of economic depression, shrinking population, debt crisis and bankruptcy, natural disasters, the COVID-19 pandemic, and government mismanagement. A major deal to restructure debt has raised hopes that the island is on a path to economic recovery, while supporters of statehood have pressed for a binding referendum on the island's status.

Article 4, Section 3, of the U.S. Constitution, known as the territorial clause, gives Congress broad authority to govern U.S. territories. Puerto Rico is the most populous U.S. territory. Others include American Samoa, Guam, the Northern Mariana Islands, and the Virgin Islands. They are granted various measures of self-rule but lack their own sovereignty.

*Milton Flores y Asociados, C.S.P.*                                                                                   *38*
*Real Estate Appraisers & Consultants*

Though Puerto Ricans are U.S. citizens eligible for military conscription and subject to federal laws, they lack full congressional representation. A single member of the U.S. House of Representatives, known as the resident commissioner, represents the island᾽s interests but has no voting power; Jennifer González-Colón has held the position since 2017. Nor can Puerto Rico residents cast ballots in U.S. general elections, though presidential candidates curried support on the island in 2020 to win votes from the Puerto Rican diaspora in the primary race.

Puerto Rico also lacks economic sovereignty. The U.S. dollar is its currency, U.S. federal regulators oversee its businesses, and U.S. laws dictate its trade policy. Residents pay most federal taxes; their contributions totaled more than $4 Billion in fiscal year 2021. However, Puerto Ricans generally do not pay federal income tax, and they continue to enjoy the tax exemptions that have historically incentivized outside investment. Largely because of these exemptions, residents receive fewer federal benefits than other Americans. Puerto Rico residents are ineligible for the Earned Income Tax Credit and earn less, on average, in Social Security and veterans' benefits. However, some benefits could change because of legal challenges.

In August 2020, a district court judge ruled that denying island residents several forms of federal assistance, including Supplemental Security Income (SSI), is unconstitutional. The federal government appealed the decision, and in November 2021, the case was heard by an appeals court, which held that Puerto Rico᾽s exclusion from the SSI program violates the fifth amendment.

In April 2022, the Supreme Court reversed that decision. Like most of US States, the island receives billions of dollars more in federal spending, including on Medicare and Social Security, than its residents pay in taxes. In addition, the U.S. government has allocated more than $25 Billions in disaster-recovery funding to the island since 2017.

Puerto Rico continues to be ravaged by a sustained recession. Annual economic growth fell by roughly 12.5% overall between 2004 and 2020, while Puerto Rico᾽s population shrunk by more than 16%. It has also struggled under a large public debt in recent years, totaling about $70 Billion− or 68 percent of gross domestic product (GDP)− in 2020. Puerto Rico's downward spiral has been compounded by natural disasters, government mismanagement and corruption, and the COVID-19 pandemic. Unable to borrow on global markets, Puerto Rico was in economic limbo for years after turning over its budget to an independent control board appointed by Washington as part of a plan to restructure its debts. Making matters worse, in 2019, U.S. authorities arrested former high-level officials in a corruption scandal, leading to the resignation of Governor Ricardo Rosselló.

The island's average household income is about one-third of the U.S. average, and its poverty rate is more than twice that of the poorest state, Mississippi. Meanwhile, the territory's unemployment rate has stayed at almost twice the national average for the past decade, at times reaching double digits. However, it fell to about 8% in 2021 and has continued to drop. Experts say the island's economic crisis is rooted in twentieth-century legislation that encouraged Puerto Rico's reliance on debt to fill federal funding gaps. It did this by giving bond investors higher returns and loosening borrowing limits. Since 1917, lenders to Puerto Rico have been exempt from local, state, and federal taxes— the so-called triple tax exemption— effectively boosting their profits and making the island a more attractive investment.

The territory's constitution also allows Puerto Rico to balance its budget with its debt, among other provisions that facilitate borrowing. The debt problem accelerated after 1996, when the U.S. government began phasing out Internal Revenue Code Section 936. This provision had allowed American businesses to operate tax-free in Puerto Rico, which critics viewed as a windfall for wealthy corporations. Section 936's repeal triggered a recession of Puerto Rico's manufacturing sector, and the territorial government increasingly turned to debt to cover its spending.

The 2008 global financial crisis hit Puerto Rico especially hard, with the recession further lowering tax revenues, souring an early-2000s construction boom, and giving investors pause. The territorial government implemented austerity measures, including layoffs of public workers, that sent unemployment soaring. It also crafted dubious deals to balance its budget, including letting government agencies borrow from one another to pay back bonds.

On top of that, experts say, much of this money was poorly spent. Leaders failed to parlay the billions of dollars they borrowed into strong institutions, a deficit laid bare by the natural disasters that have devastated Puerto Rico's underfunded and poorly maintained infrastructure. Hurricane Maria brought ruin to the island in 2017, causing about 3,000.0 death, knocking out the electrical power grid, and costing tens of billions of dollars. An earthquake at the start of 2020, the island's strongest in a century, also created a power blackout. Months later, the pandemic exposed the territory's inefficient Health System, which critics say has impeded care for COVID-19 patients. In September 2022, Hurricane Fiona caused severe flooding and knocked out power to more than one million homes and businesses. The combination of government mismanagement and unrelenting natural disasters has driven an exodus from territory, further depressing economic activity, crippling schools and other institutions, and leaving fewer taxpayers to shoulder the debt. More than 130,000 residents fled to the mainland after Hurricane Maria alone. Today, more people of Puerto Rican descent live on the mainland than on the island, and a 2019 study projected that the territory's population would fall by another 8% by 2024.

*Milton Flores y Asociados, C.S.P.*                                                                **40**
*Real Estate Appraisers & Consultants*

Since it began defaulting on major debt obligations in 2016, Puerto Rico has struggled with how to pay its creditors— many of whom hold bonds that are protected by Puerto Rico᾽s constitution— while maintaining basic public services and avoiding an even deeper economic collapse. It took more than five years of negotiations for a federally appointed oversight board to approve a restructuring plan, and controversy persists. As a territory, Puerto Rico's options were limited from the beginning. It could not receive assistance from the International monetary fund, like insolvent countries such as Greece have. Neither could it file for Chapter 9 bankruptcy, which municipalities such as Detroit have used to receive legal protection against creditor claims while restructuring their payments. Then there is the sheer size of the debt: Puerto Rico's is by far the biggest government bankruptcy in U.S. history.

The island's legislature tried to design its own restructuring process, which would have allowed public services to continue uninterrupted while it negotiated lower debt payments, but the U.S. Supreme Court rejected the law.

Congress and President Barack Obama's administration drew up an alternative plan, the 2016 Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA). Most notably, PROMESA created a seven-member financial oversight board appointed by the White House that was granted full control of Puerto Rico's finances. It also created a debt restructuring process like Chapter 9 that governed negotiations with creditors to reduce debt payments.

Those negotiations were beset by controversy, as it became clear that all involved bondholders, Puerto Rican pension funds, and other public services faced steep losses. Several versions of a sweeping plan to cut the island's debt were floated, but creditors promised legal challenges, and efforts were paused due to the COVID-19 pandemic.

In January 2022, a federal judge approved a final plan between the PROMESA board and Puerto Rico's government, paving the way for the island to escape bankruptcy and resume making payments to creditors. The deal cuts $33 billion in total debt obligations down to $7.4 billion, lowering Puerto Rico's annual debt payments from nearly $4 billion to just over $1 billion. Supporters say the deal puts the island on a sustainable path while avoiding any cuts to public pensions, which had been a major point of contention. However, critics are wary of the resolution. Some argue that cutting debt without requiring deeper structural reforms means problems are likely to be repeated. Others worry that maintaining pension responsibilities, which amount to $2.3 billion yearly will prove unsustainable. Advocacy groups such as the Center for Popular Democracy say the deal will result in more economic austerity, including cuts to health care and education. They echo many critics who oppose the PROMESA process on the grounds that it undermines the territory's already weak self-rule. PROMESA's oversight board will remain in place until Puerto Rico meets several financial milestones— three more years at least.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*41*

Meanwhile, experts have suggested that Puerto Rico's restructuring experience could be a test case for heavily indebted U.S. states such as Illinois and New Jersey, which are also constitutionally ineligible for bankruptcy protections. The island's relationship with the rest of the United States is the subject of vigorous debate. Puerto Rico's political parties, which are distinct from the mainland's Democratic and Republican blocs, hold different views on changing the island's status. The five major positions are:

Status quo. Some say the U.S. Puerto Rico relationship should remain as is. The centrist Popular Democratic Party (PPD) has historically championed the status quo, which is also called the commonwealth position.

Enhanced commonwealth. Others, including some PPD members, advocate what they call an enhanced version of Puerto Rico's current commonwealth status. This could include allowing the island to conduct its own foreign policy and exempting it from federal law. However, U.S. officials including a presidential task force and the Justice Department have repeatedly dismissed this option.

Statehood. Proponents of statehood, including the island's other major party, the New Progressive Party, say it would finally make Puerto Ricans full citizens. Additionally, the island could receive up to 12.5 billion more in federal benefits, including Medicare and Medicaid, according to recent estimates. The U.S. Constitution gives Congress the authority to create new states, though territories have no defined road to statehood, and giving Puerto Rico senators and full representatives could shift the country's balance of power.

Independence. Puerto Rico has a long history of pro-independence movements, dating back to uprisings against Spanish and American colonial rule. Nationalists have attempted to assassinate a U.S. president, Harry Truman, and they carried out a wave of more than 130 bombings on the mainland during the 1970s and 1980s. The island's Independence Party argues for full sovereignty, but support for that position has dwindled to single digits.

Free association. Supporters of free association envision an independent, sovereign Puerto Rico still closely linked to the United States. The federal government has similar relationships with the Marshall Islands, Micronesia, and Palau, whose residents receive U.S. aid, military protection, and immigration benefits, but not citizenship.

Residents have weighed in on Puerto Rico's status in six plebiscites since 1967. In November 2020, more than 52 percent of voters favored the territory's immediate admission into the Union as a state. Roughly half of eligible voters participated in the referendum, up from only 23% in 2017, when inconsistent options, allegedly biased ballot language, and boycotts cast doubts on the results. Some presidents have sought to move the needle on Puerto Rican rights and status. More recently, President Donald Trump opposed granting Puerto Rico statehood.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                                                   *42*
*Real Estate Appraisers & Consultants*

President Biden has expressed his support for statehood, but his administration has prioritized helping the island recover. Though Congress has historically declined to pursue the matter, some House Democrats have advanced the PR status Act, which proposes a binding plebiscite on the territory's status to be held in November 2023. However, the bill faces opposition from some lawmakers as well as from some Puerto Rico community leaders.

Many experts say it is unlikely to advance in Congress. Beyond a change in political status, Washington could do more to ease Puerto Rico's crisis, observers say. Some have called for federal policymakers to implement an economic stimulus program, which the territorial government cannot do because of federally imposed spending restrictions. The Obama-era Affordable Care Act (ACA) provided Puerto Rico with billions of dollars in additional spending, but the ACA aid expired in 2019.

Others propose that Congress change territory-specific policies that disadvantage Puerto Rico. The Jones Act, passed in 1920, requires goods traveling by sea between the mainland and Puerto Rico to be transported only by U.S.-built, -owned, and -operated vessels, which drives up prices on the island. Repealing it could create more than thirteen thousand jobs and inject $1.5 billion into the economy, a 2019 study found. Meanwhile, some experts say that tax changes, including partially resurrecting Section 936, could revive Puerto Rico's once-thriving pharmaceutical sector, stimulate the territory's economy, and reduce U.S. dependence on international drug suppliers.

Disaster relief is another area of contention. Washington has allocated more than $68 Billion in emergency aid to the island since 2017, but the Trump administration was criticized for what research says was a slower, smaller federal response following Hurricane Maria compared to what states have received after natural disasters. Five years after the storm, only about one-fifth of allocated government relief funds has reached the island. After earthquakes wracked Puerto Rico in January 2020, the administration released about $16 billion in already allocated relief for the territory. However, the aid came with stringent conditions and was subject to PROMESA oversight. That September, the Trump administration announced almost $13 billion in new aid to repair Puerto Rico's hurricane-ravaged electrical grid and schools.

Puerto Rico has also benefited from the federal COVID-19 stimulus. However, experts have urged Washington to authorize additional aid that accounts for gaps in Puerto Rico's social safety net, which are linked to its status as a territory, and the island's pre-pandemic crises. During his presidential campaign, Biden released a plan to ease Puerto Rico's multilayered crisis, including by facilitating reconstruction; reducing the territory's debt burden; and expanding access to and funding for social services. In April 2021, Biden freed up more than $8 billion in disaster-relief funding for Puerto Rico, and in July, his administration revived a White House task force to better coordinate federal policy toward the island. In the days following Hurricane Fiona, Biden declared an emergency, dispatched hundreds of federal employees to the island, and announced that Washington would cover a month of aid spending.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*     *43*
*Real Estate Appraisers & Consultants*

**Economy of Puerto Rico**



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*44*



## DISCLAMER

The Economic Development Bank for Puerto Rico (EDB), the Government of Puerto Rico, its instrumentalities and agencies (the "Government"), and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with EDB and the Government, the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein and all Parties expressly disclaim any such representations or warranties. The Government has had to rely upon preliminary information and unaudited financials for 2015, 2016 and 2017 in addition to the inherent complexities resulting from a prolonged period of lack of financial transparency. As such, EDB and the Government have made certain assumptions that may materially change once those financial statements are fully audited. The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including without limitation consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of this presentation or that is otherwise consequent upon the gaining of access to this document by such third party. The Parties do not undertake any duty to update the information contained herein. This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Parties do not express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein. Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various legal, financial, social, economic, environmental, governmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government, but also by Financial Oversight and Management Board for Puerto Rico and other third-party entities such as the government of the United States. Examples of these factors include, but are not limited to,: – Any future actions taken or not taken by the United States government related to Medicaid or the Affordable Care Act; – The amount and timing of receipt of any distributions from the Federal Emergency Management Agency and private insurance companies to repair damage caused by Hurricanes María and Irma; – The amount and timing of receipt of any amounts allocated to Puerto Rico and provided under the Community Disaster Loans Program; – The amount and timing of receipt of any additional amounts appropriated by the United States government to address the funding gap described herein; – The timeline for completion of the work being done by the Puerto Rico Electric Power Authority ("PREPA") to repair PREPA's electric system and infrastructure and the impact of any future developments or issues related to PREPA's electric system and infrastructure on Puerto Rico's economic growth; – The impact of the measures described herein on outmigration; and – The impact of the resolution of any pending litigation in the Title III cases Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document should be considered as an express or implied commitment to do or take, or to refrain from taking, any action by EDB, the Government, or any government instrumentality in the Government or an admission of any fact or future event. Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision. By receiving this document, the recipient shall be deemed to have acknowledged and agreed to the terms of these limitations. This document may contain capitalized terms that are not defined herein or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should refer questions to EDB (BDE@bde.pr.gov) should clarification be required.

1/16/2025

2

**ECONOMIC DEVELOPMENT**
BANK FOR PUERTO RICO

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*45*



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*46*

# Definitions

| | |
|---|---|
| ARRA | American Recovery and Reinvestment Act of 2009 |
| BLS | Bureau of Labor Statistics of the United States Department of Labor and Human Resources |
| COFINA | Puerto Rico Sales Tax Financing Corporation (Spanish acronym) |
| EAI | Economic Activity Index |
| EDB | Economic Development Bank for Puerto Rico |
| FY | Puerto Rico's Fiscal Year (July-June) |
| GDB | Government Development Bank for Puerto Rico |
| GNP | Puerto Rico's Gross Product |
| GNP54 | Puerto Rico's Real Gross Product |
| kWh | Kilowatt-hour |
| m-o-m | Month-over-month |
| PREPA | Puerto Rico Electric Power Authority |
| PRDT | Puerto Rico Department of Treasury |
| s. a. | Seasonally adjusted |
| TCB | The Conference Board is a Company that promotes the understanding of business practices and economic cycles and supports and undertake nonpartisan analysis and research. |
| y-o-y | Year-over-year |

1/16/2025

Go to Contents

4



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*47*

## Description of the EDB-EAI

The EDB-EAI is a coincident index for the economic activity of Puerto Rico. It is highly correlated to Puerto Rico's real GNP in both level and annual growth rates.

This index's methodology is similar to the one used in TCB's coincident index of the US economy. This methodology follows a standard procedure to adjust the data for seasonality and volatility factors.



**Real Gross National Product as a function of the EDB Economic Activity Index**

Relationship on the levels: (FY1981-FY2022)

$y = 46.968x - 101.41$
$R^2 = 0.9253$



Relationship on the growth rates (FY1982-FY2022)

$y = 0.7302x + 0.0044$
$R^2 = 0.8579$

1/16/2025

Go to Contents

5

ECONOMIC DEVELOPMENT BANK FOR PUERTO RICO

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*48*



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*49*

## Interpretation of the EDB-EAI

The EDB-EAI is an indicator of general economic activity, not a direct measurement of Puerto Rico's real GNP. The annual growth rate of the EAI is not the same as the annual growth rate of the Island's real GNP. The EAI does not include all the economic sectors that comprise the GNP.

When annualized, the level of the EAI is highly correlated with the level of the real GNP (with a Pearson correlation coefficient of 0.9619; i.e., 96% for FY1981-FY2022).

The annual growth rates of both variables are also highly correlated (with a Pearson correlation coefficient of 0.9262; i.e., 93% for FY1982-FY2022).

Nevertheless, the annual growth rate of the EAI IS NOT the same as the annual growth rate of the real GNP, since being highly correlated does not mean being identical.

In order to calculate an approximate of the real GNP trend from the EAI annual growth, the EDB estimates a linear regression model relating both variables.

Plugging-in the EAI annual growth rates into the resulting equation produces real GNP annual growth rate estimates relatively comparable to the real GNP annual growth figures published by the Puerto Rico Planning Board.

1/16/2025

Go to Contents

7

ECONOMIC DEVELOPMENT BANK FOR PUERTO RICO

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*50*



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*51*

## Interpretation of the EDB-EAI

Sources: Puerto Rico Planning Board and EDB.

| Fiscal Year | EDB-EAI annual growth | Real GNP annual growth estimated using the EDB-EAI | Current real GNP annual growth |
|---|---|---|---|
| 2000 | 2.5% | 2.2% | 3.0% |
| 2001 | 0.9% | 1.1% | 1.5% |
| 2002 | -1.2% | -0.4% | -0.3% |
| 2003 | 1.8% | 1.7% | 2.1% |
| 2004 | 2.2% | 2.1% | 2.7% |
| 2005 | 1.4% | 1.5% | 1.9% |
| 2006 | 0.2% | 0.6% | 0.5% |
| 2007 | -1.5% | -0.6% | -1.2% |
| 2008 | -2.5% | -1.4% | -2.9% |
| 2009 | -4.7% | -3.0% | -3.8% |
| 2010 | -5.1% | -3.3% | -3.6% |
| 2011 | -2.8% | -1.6% | -1.7% |
| 2012 | -0.1% | 0.4% | 0.5% |
| 2013 | -0.4% | 0.2% | -0.1% |
| 2014 | -3.3% | -2.0% | -1.8% |
| 2015 | -2.0% | -1.0% | -0.8% |
| 2016 | -1.7% | -0.8% | -1.6% |
| 2017 | -1.9% | -1.0% | -3.2% |
| 2018 | -7.1% | -4.8% | -4.2% |
| 2019 | 6.8% | 5.4% | 2.1% |
| 2020 | -2.9% | -1.6% | -3.1% |
| 2021 | 1.8% | 1.7% | 0.9% |
| 2022 | 2.3% | 2.1% | 3.7% |

The EDB-EAI is an indicator of general economic activity, **not** a direct measurement of the real GNP. The annual growth rate of the EAI **is not** the same as the annual growth rate of the real GNP. The EAI **does not** include all the economic sectors that comprise the GNP.

Real GNP growth estimates based on the EAI have been relatively close (**although not identical**) to the actual real GNP growth figures, though they do maintain the same trend.

The real GNP growth for **FY2021** was estimated at **1.7%** using a regression equation with the growth of the EAI as the independent variable, while the P.R. Planning Board reported an increase of **0.9%**.

For **FY2022**, the index-based estimate for the real GNP growth was **2.1%** compared to the **3.7%** current Planning Board's preliminary estimate for that year.

On a methodological note, the index's annual growth is calculated as the annual percentage change of its twelve-month average.

1/16/2025    Go to Contents    9


ECONOMIC DEVELOPMENT BANK FOR PUERTO RICO

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*52*

## EDB-EAI Overview – October & November

The EDB-EAI contracted by 1.3% in October and 1.1% in November when compared to the same period of the previous year. Also, it decreased by 0.2% and 0.1% in a m-o-m basis.

The **EDB-EAI, s. a.**, reached to **126.6** points in **October** and **126.4** in **November**; which represents **decreases of 1.3% and 1.1%**, respectively, when compared to the same period of the previous year. The recovery in economic activity maintained an up-trend pace during 28 consecutive months; which is consistent with labor reports displaying employment gains across various industries. However, energy costs remain high, inflationary pressures are still a concern, and the geopolitical pressures are proving to be a major uncertainty factor.

During fiscal year 2023, the **EDB-EAI, s. a.**, increased by 2.4% when compared to fiscal year 2023, and advanced by **1.6%** during the **fiscal year 2024**. But, for the period of **July – November of fiscal year 2025** it **declined** by **1.0%**. Moreover, an increment of 2.6% was registered during calendar year 2023, after a 3.1% growth during calendar year 2022. However, for the **January – November 2024** period it **declined by 0.6%** when compared to the same period of calendar year 2023.

**Total non-farm payroll employment, s. a.**, averaged 963,200 jobs in October and 966,600 jobs in November, which means an expansion of 0.3% and 0.4%, in a m-o-m basis. The annual increment was 1.4% and 1.7%, in that order.

**Electric power generation, s. a.**, for October 2024, totaled 1,621.7 million kWh and for November 1,555.8 million kWh. These results showed an upturn of 0.8% for October and a drop of 4.1% for November, in a m-o-m basis. The y-o-y results were reductions of 1.4% and 2.7%, in that order.

The preliminary estimate for **gasoline consumption\*, s. a.**, in October 2024 totaled 62.5 million of gallons, showing an advance of 0.7% from September. For November it totaled 66.4 million of gallons which represented an upsurge of 6.2% with respect to the previous month. It fell by 10.6% in October and by 7.0% in November when compared to the same month of the previous year.

**Cement sales, s. a.**, totaled 1.3 million of 94lb. bags for October 2024 with an advance of 0.9% compared to September 2024 and totaled 1.2 million of 94lb. bags for November or a drop of 11.8%, in a m-o-m basis. These results represent a year-on-year growth of 10.1% and a reduction of 6.9% for October and November, respectively.

Sources: BLS, LUMA Energy, PRDT and EDB.

\*    EDB applies a 3-month moving average adjustment to the gasoline consumption data.

1/16/2025

Go to Contents

10

**ECONOMIC DEVELOPMENT** BANK FOR PUERTO RICO

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*53*

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*54*



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                                                           55
*Real Estate Appraisers & Consultants*



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*56*



Total Non-Farm Payroll Employment, s. a., (000's) 2016-2025

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

57



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

58



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*59*



Go to Contents

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*60*



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*61*



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*62*

## Conclusions

The EDB-EAI reached 126.6 points in October and 126.4 points in November 2024, with decreases of 0.2% and 0.1% in a m-o-m basis, correspondingly. On a y-o-y basis, the Index decayed by 1.3% and 1.1%, in that order.

The Index grew by 2.4% during fiscal year 2023, and by 1.6% for the fiscal year 2024. For the period July – November of fiscal year 2025 it recorded a diminution of 1.0%. Similarly, for the calendar year 2023 it closed with an expansion of 2.6%. However, for the period January – November of calendar year 2024, it deteriorated by 0.6% when compared to the same period of previous year.

The EDB-EAI y-o-y percent change increased for 28 consecutive months as the restrictive measures taken to contain the effects of COVID-19 became more flexible, trailing henceforth an improvement in the economic activity.

Although job gains continued across labor reports, particularly in industries like manufacturing, construction, trade and services, certain factors are still of concern. The inflationary trend that has been recorded since 2022 has continued, although with a slower growth rate, high energy costs and service instability, and geopolitical pressures add uncertainty to the Island's economic activity, as they do throughout the rest of the world.

During November 2024, two Index's s. a. components registered monthly growth: non-farm payroll employment (0.4%) and gasoline consumption (6.2%), while electric energy generation and cement sales declined by 4.1% and 11.8%, respectively.

When compared against the same month from the previous year (November 2023), non-farm payroll employment improved by 1.7%; whereas the rest of the components decreased: cement sales (6.9%), gasoline consumption (7.0%) and electric energy generation (2.7%).

1/16/2025

Go to Contents

20



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

Case 3:25-cv-01529-ADC     Document 1     Filed 10/01/25     Page 107 of 159

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*63*



## References

Studies, C. o. (2024, October & November). *The Puerto Rico Economic Activity Index (EDB-EAI)*. Retrieved from Economic Development Bank for
 Puerto Rico: https://www.bde.pr.gov/BDE/PREDDOCS/EDB-EAI.pdf

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

**Cabo Rojo Municipality**

**Cabo Rojo, Puerto Rico**

(KAH-bo, ro-ho)



Cabo Rojo is known as *"El Pueblo de Cofresí"* (Cofresí's town). Cabo Rojo was founded in December 17, 1771 by Nicolás Ramírez Arellano and Miguel de Muesas.

It is said that Cabo Rojo obtained its name by the considerable amount of minerals in its coasts that made the waters look reddish. *Cabo* means headland and *rojo*, means the color red.



Located in the southwest corner of Puerto Rico, Cabo Rojo is surrounded by miles and miles of beaches. It also stands at the mouth of the Boqueron bay, one of Puerto Rico's deepest and best protected harbors, extending some 3 1/2 miles inland, sheltering over a mile of white sand bordered by clear water is wonderful for swimming and lounging, it is the town's most popular beach destination with a good reason.

There are many places to visit in Cabo Rojo, including the **Cabo Rojo National Wildlife Refuge**, a subtropical dry forest, has a visitors center and interpretive displays as well as bird-watching trails, 50 bird species, several endangered. No camping allowed. Open Mon-Fri from 7:00am to 4:00pm, (787) 851-7258.

Cabo Rojo is also home of the **Punta Guaniquilla Reserve** this 388-acre reserve protects a diverse landscape that includes an arid promontory, a dry forest, palm and mangrove fringes, unique limestone formations in two lagoons, a cave system, cacti, and swamp areas. The tract is notable as the habitat of the endangered West Indian Whistling Duck, the Ruddy Duck, and the Caribbean Coot. The site is also recognized as a migratory bird sanctuary and an important wintering ground for shore birds.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*65*

**Esperanza Melancólica**
**Photo: Rosa A. Díaz**



The **Cabo Rojo Lighthouse**, located on Route 303,stands as a historic gem. Built in 1881 over limestone cliffs that drop 200 feet into the sea, it is known as *"Faro de Los Morillos"*. This old lighthouse transitioned to automation and electricity in 1967, it remains a beacon of both the past and present. Visitors to the Cabo Rojo Lighthouse are treated to more than a historical experience; the location promises spectacular views, the lighthouse offers a breathtaking panorama that captivates all who venture there. For inquiries or additional information, you can contact them at (787) 851-1025.

The **Museo de Los Próceres** is a cultual heaven, offering a diverse range of exhibits and activities for visitors. It includes sculpture exhibition of national leaders, an Indian Culture gallery, exhibits of Puerto Rican contemporary artists, a collection of paintings and a theater for plays and conferences. Free admission. Open Mon-Sat 8am - 4:30pm. For inquiries or additional details, you can reach the museum at (787) 255-1580.

The first city church, **San José Church** is an iconic historical and architectural landmark. This church was inaugurated in 1783 and it is recognized for its neoclassical design and cultural significance. If you plan to visit the San Jose Church, you may want to check for specific visiting hours or events taking place at the church, as it may also host cultural or religious activities throughout the year.

Additional Places and Sights

Other places worth exploring include:

- Boquerón Beach
- Buye Beach, just north of the village of Boquer—n, on route 307 at Km 4.8.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

- Combate Beach, Rt 3301
- Joyuda Beach
- Isla Ratones
- Plaza de Recreo Ramón Emeterio Betances
- Punta Arenas Beach
- Punta Real Beach



## Geography

Cabo Rojo territory is mostly flat because the city it is located on the Western Costal Valley. Bordering the Caribbean Sea, south of Mayagüez and Hormigueros; and west of Hormigueros, San Germán and Lajas. Its rivers are: Guanajibo, Cajul, Seco, Viejo and Caño Conde Avila.

Cabo Rojo is made up of 15 barrios (wards/districts):

- Bajura
- Betances
- Boquerón
- El Combate
- Guanajibo
- Joyuda
- Llanos Costas
- Llanos Tuna
- Miradero
- Monte Grande
- Pedernales
- Pole Ojea
- Pueblo
- Puerto Real

## Climate

Cabo Rojo enjoys year-round summer temperatures, an average annual temperature of 79.3°F (26.3°C). On average, the warmest month is August, and the coolest month is February.

Cabo Rojo averages 21.9 inches (556 mm) of rain per year. September is the average wettest month.

## CABO ROJO WEATHER

10 Day Forecast from weather.com

## Notable People

There are many well-known "caborrojeños", among them:

- Roberto Cofresí y Ramírez de Arellano, pirate

- Salvador Brau, writer

- Ramón Emeterio Betances y Alacán, politician

## Accommodations

- **Mirador del Sol** (Rental), 321-278-8540

- **A Boquerón Bay Guest House** (Small Inn), (787) 255-0224

- **Aquarius Vacation Club** (Hotel), (787) 999-6330

- **Boquerón Beach Hotel** (Hotel), (787) 851-7110

- **Cofresí Beach Hotel** (Hotel), (787) 254-3000

- **Highway Inn** (Hotel), (787) 851-1839

- **Mojacasabe** (Villa), (787) 254-4888

- **Parador Bahía Salinas Beach Resort & Spa** (Parador), 787-254-1213

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

68

- **Parador Boquemar** (Parador), (787) 851-2158
- **Parador Joyuda Beach** (Parador), 1-800-981-7575 or (787) 851-5650
- **Parador Perichi's** (Parador), 1-800-435-7197 (787) 851-3131
- **Punta Aguila Resort** (Resort), (787) 254-4954
- **Tony's Restaurant and Hotel** (Hotel), 787-851-2500
- **Wildflowers Guest House** (Guest House), (787) 851-1793

## Restaurants

- **Agua al Cuello** (Sea Food/International), (787) 254-1212
- **Capelas Bar** (Puerto Rican), (787) 851-7110
- **Cascada** (Sea Food), (787) 851-2158
- **El Bohío** (Sea Food), (787) 851-2755
- **El Caribe** (International), (787) 255-2085
- **Island View** (Sea Food), (787) 851-9264
- **Island View** (Sea Food), (787) 851-9264
- **La Borinqueña** (Puerto Rican), (787) 851-5048
- **La Cascada** (Puerto Rican), (787) 851-2158
- **Papa Marcos Cuisine & Bistro** (French), (787) 254-2242
- **Perichi's** (International), (787) 851-3131 Fax (787) 851-0560
- **Restaurant Cuesta Blanca** (Sea Food), (787) 851-6899
- **Tino's Restaurant** (Sea Food), (787) 851-2976
- **Tony's Restaurant** (Puerto Rican), (787) 851-2500

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

**Festivals and Events**

- **Cruce Bahía Boquerón** - July

- **Festival de la Paleta** - December

- **Festival del Chigüero** - April

- **Festival del Melón** - July

- **Festival del Ostión** - May

- **Festival del Pescao** - March

- **Festival Le Lo Lai** - December

- **Fiestas Patronales de San Miguel Arcángel** - September Every year, Cabo Rojo celebrates a patron saint festival. The festivities include dances, food, parades and religious processions. (787) 851-1025

- **Jornada a Betances** - April Commenmorates the birth of Dr. Ramon Emeterio Betances. 19th century abolitionist and independence leader. (787) 851-1025

- **Retorono a la Arena** - July

- **Tejido de Sombreros** - May

**Education**

There are 16 public schools in Cabo+Rojo, education is handled by the Puerto Rico Department of Education.

**Symbols**

**Flag**



Anthem: Hoy estoy triste por la distancia...

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*70*

## Demographics *

Population
47,060

Puerto Rico: 3,285,874

Land Area: 70.37 sq mi

Density: 681.8 per sq mi

Median Age: 44.6

Sex: 53% female

## Economics **

Per capita income
$10,176
Puerto Rico: $21,058

Median household income: $17,261
Puerto Rico: $21,058

Persons below poverty line: 50.9%

## Housing, families and educational attainment *

Number of households
16,211
Housing units density:
429.2 (2013)

Persons per household: 2.95

High school grad or higher: 71.5%

Marital status: 39% married

* U.S. Census Bureau 2020 data, unless otherwise noted - Source: Quick Facts Puerto Rico.
** U.S. Census Bureau 2016-2020

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*71*

## Map References

Coordinates: 18.0867° N, 67.1458° W

ZIP Code: 00622, 00623

Driving Distance from San Juan: 112.4 miles

Driving Time: 2 hours, 36 minutes

## References

reserved., C. ©. (2025) Magaly Rivera. *Cabo Rojo, Puerto Rico*. Retrieved from Welcome to Puerto
    Rico!: https://welcome.topuertorico.org/city/caborojo.shtml

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

## Neighborhood Analysis

A neighborhood is a group of complementary land uses, or an area in which social, economic, governmental and environmental forces influence property value in all surrounding properties in the same way. The subject property is located adjacent to various hotels, rentals and marinas; at the North side of PR State Road 101 and East side to PR State Road 100. Due to the heavy traffic along the street at all times, the subject site is considered to have excellent exposure.  Properties along these streets are predominantly commercial in use, while properties in interior and adjacent streets are mostly residential.  The subject property is located at an active commercial and residential area which surrounds the subject's neighborhood.  It is close to PR State Road 2 on the East side.

It takes approximately 10 minutes to drive from the subject property to the Cabo Rojo urban area in normal traffic hours. This provides the neighborhood with good location and access characteristics.

It is close to PR State Road 2, which has placed the subject property in an advantageous position to vie for a commercial hub location to service outlying areas. The subject area is located within relatively proximity and with good access facilities to some of the most important commercial and urban centers of the Cabo Rojo Area.  It is provided with most services and amenities such as running water, electric power, asphalt paved roads and telephone lines typical of large suburban areas in Puerto Rico.  There is fire and police protection, together with schools, hospitals, churches, shopping areas, and most types of commercial and business facilities located at reasonable distances within the area.

The neighborhood has all the services and amenities typical of large metropolitan areas. Curbs, gutters, and sidewalks are concrete, while streets are usually asphalt, fire and police protection are provided together with schools, hospitals, churches, and all types of commercial and offices facilities within very short distances.  The appraisers foresee a continuation of the existing upward trends due to the good location and supporting facilities.

In conclusion, the analysis of the appraisers reveals that this neighborhood, due to its good location and access facilities, will see a reasonable growth within the immediate and foreseeable future.

*Milton Flores y Asociados, C.S.P.*                                                                     *73*
*Real Estate Appraisers & Consultants*

## Neighborhood Description

The subject neighborhood is a growing sector, and the property is close to PR State Roads 100 & 101. Development in the neighborhood is primarily residential and commercial. Backup land uses include some residential structures behind the subject property and commercial facilities surrounding the subject property.  Areas interchanges as well are generally residential and commercial properties.

The neighborhood has a favorable impact on the subject property.  The area where the subject property is located has an average and relatively healthy, economic base. Development in the area has been on the increase over the past years and is expected to continue. In addition, the neighborhood has experienced some new construction close to the subject property. Further, the area's accessibility by major freeways as well as by local roads allows the subject property to be reachable from a wide area as well as from the immediate neighborhood.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

| NEIGHBORHOOD DESCRIPTION | |
|---|---|
| **Municipality** | **Cabo Rojo** |
| **Development** | **Boquerón Ward** |
| **Neighborhood Location** | **The subject property is located within the boundary limit of Cabo Rojo. Its main access is PR State Road 100. The vicinity is mainly commercial.** |
| **Boundaries:** | |
| **North** | **PR Road 100** |
| **South** | **PR Road 101** |
| **East** | **PR Road 103** |
| **West** | **PR Road 100** |
| **Road Linkages** | **PR State Road 2** |
| **Zoning Parameters** | **Agrícola and Reserva Uno (AR-1) which allows medium-density commercial and residential related uses.** |
| **Land Uses** | **Mostly commercial, institutional and residential uses.** |
| **Neighborhood Characteristics** | **The location is in the West area of Puerto Rico, in an area with a well-balanced mix of commercial, institutional, and residential concerns, along with good road linkages to PR State Road 2** |
| **Economic Base, Factors** | **Cabo Rojo is part of the seaside area of Puerto Rico. It is a strong residential, commercial, industrial and institutional base.** |
| **Existing Construction** | **Mostly commercial, offices, institutional and residential.** |
| **New Construction** | **Commercial** |
| **Neighborhood Trends** | **The subject neighborhood is a residential, commercial with some institutional development. There is an average market for properties in the sector, evident in moderate demand factors.** |

*Milton Flores y Asociados, C.S.P.*                                                                 *75*
*Real Estate Appraisers & Consultants*

## Site Overview



The subject property land site is one level and irregular parcel with **approximately 13.3 cuerdas of area**. It is bounded by PR State Road 100 and 101. The area within a radius of one block of the subject site appears to be 40% developed commercially; 50% residential and 10% industrial therefore, the subject neighborhood provides a good environment for the subject being appraised and there are no factors that will negatively affect the marketability of the site. Development within the area consists primarily of commercial, office, restaurant, and residential uses. The subject exposition to the traffic, the availability of parking area and public transportation; increase the demand for the subject property.

The traffic generated during daylight hours, although at times moderate to heavy, does not interfere with access to the subject site. PR Road 100, a two-way road, provides easy access to surrounding streets while connecting with PR Road 101. The surrounding neighborhood comprises a mixture of land uses.

North: Vacant Land
South: PR State Road 101
East: Vacant Land
West: PR State Road 100

In other words, the subject's immediate neighborhood is a mixture of commercial and residential land uses. The property is located on a major traffic street with good access to the surrounding roads. There are indications of major changes to the area soon to commercial use. Has an excellent location for commercial use due to the active traffic pattern, the proximity to commercial buildings properties. The subject site's configuration and access characteristics are excellent, since the subject property has a good frontage to the main street, and it is close to Cabo Rojo Town Core. Overall, the area favorably impacts the subject property, its surroundings are stable, and development is occurring at moderate pace.



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

## Competition Study

The subject property is generally well positioned in the local market.  It offers a good mixed tenant environment that will enable it to compete in the area. After analyzing the above date of competitive properties and taking into consideration the vacancy rate of similar properties, tenants mix occupancy, proposed or future lease space available the appraiser could conclude:

1.  No major changes are expected in the existing competitive commercial properties
2.  No other proposed commercial or competition is expected soon
3.  The demand for commercial areas will continue to grow slowly but gradually increase in the neighborhood.

## Subject Improvements

### Land Improvements

The appraised property consists of an irregular parcel containing a total area of 13.3 cuerdas. The land parcel is at street grade and has adequate drainage.  All city utilities are available, including water, sewer, electric and telephone services.  Land improvements included in the appraisal are asphalt paving, concrete sidewalks, curbing and minimal landscaping. The land improvements were in place on the appraisal date and were in good condition.  Access to the sites is good, where main access is off PR Road 100, a two-way asphalt road. Land improvements for the appraised property include:

**Sidewalks**       Concrete
**Landscaping**     The typical for the area
**Curbing**         Concrete
**Paving**          Asphalt
**Utilities**       Telephone, electricity, water, and cable TV

*Milton Flores y Asociados, C.S.P.*                                                        *77*
*Real Estate Appraisers & Consultants*

**Building improvements "As Is"**

The subject property commercial level site of approximately 13.3 cuerdas was improved with a one-story commercial building. It is located at PR Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico. The building's net area of 5,640.0 square feet is distributed into four (4) units plus two corridors. Reportedly, the property was extensively renovated and converted as commercial building facility. The overall building is built of reinforced concrete and concrete blocks and is in good physical condition. Interior finishes improvements include ceramic tiles, plastered and painted concrete walls, fluorescent lights, security doors and windows, and independent water pumping system. Additional improvements and systems included paved areas at the front and rear sides. The parking facilities include eighty (80) stalls with a parking ratio of 14.18:1,000 SF.

The subject property was personally inspected several times during this engagement. As of the date of the appraisal the subject property was found new and in good condition. In fact, all the subject improvements lie within the site. The subject's land-to-building coverage ratio of about 1.00% [5,640.0 square feet (buildings) ÷ 562,677.34 square feet (site)] represents a typical proportional relationship. At the time of field inspection, the subject property was designed for a commercial use facility found in good condition. Additional amenities are two corridors, independent water pumping system, and parking area. The basic construction of the building is outlined as follows:

| | |
|---|---|
| Building Use | Commercial Building |
| Number of Stories | One Story |
| Number of Buildings | One |
| Year Built | Weighted year built is 2024 |
| Gross Building Area | 5,640.0 square feet |
| Foundations | Poured perimeter foundation footings with concrete slab floors. |
| Floors | Polished Concrete at exterior areas, ceramic tiles interior areas. |
| Roof | Poured Concrete over metal framing |
| Structural Framing | Reinforced Concrete and Concrete block |
| Exterior Walls | Painted concrete block |
| Interior Walls | Painted concrete block |
| Ceilings | Dry painted plaster |
| Lighting | Fluorescent fixtures |

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                          *78*
*Real Estate Appraisers & Consultants*

| | |
|---|---|
| Ventilating & Air Conditioning | Air conditioning |
| Plumbing | Kitchens and bathrooms |
| Fire Protection | None |
| Security System | Iron work, cameras, alarm |
| Electrical Service | One two-phase 250-amp service, one single-phase 120 amp service |
| Condition/Deferred Maintenance | Overall the property is in good condition. |

The building area consists of 5,640.0 square feet used as a commercial building and found in good condition. Consists of four (4) units, each with 1,050.0 square feet, kitchen and bathroom. Additionally, there are two corridors, independent water pumping system, and a parking lot.

## *BUILDING*

|  |  | Gross Building Area | 5,640.0 square feet |
|---|---|---|---|
| Construction Type | Reinforced Concrete | Year Built | 2024 |
| Building Class | B / Good | Actual Age | 1 |
| Exterior Facade | Reinforced Concrete | Effective Age | 1 |
| Building Height | 9' clearance | Total Economic Life | 45 years |
| Pedestrian  and vehicular access by Street |  | Elevator | No |
|  |  | Staircases | No |
| Loading Docks | No | Sprinkler System | No |
| Loading Platforms | No | Toilet Facilities | Yes |
| Building to Land Ratio of Overall Site | 1.00% | Deferred Maintenance | None |
| No. of Parking Spaces | 80 | Functional Obsolescence | None |
| Parking Ratio | 14.18 | External Obsolescence | None |

| CONSTRUCTION DETAILS | DESCRIPTION |
|---|---|
| Foundation | Reinforced concrete slab on compacted fill |
| Frame | Reinforced concrete beams |
| Exterior walls | Reinforced concrete/concrete blocks |
| Roof | Pored Reinforced concrete |
| Windows | Aluminum and glass jalousie |
| HVAC System | Split Unit, central air condition |
| Interior Partitions | Concrete blocks |
| Flooring | Ceramic tiles |
| Doors | Wood, metal |
| Luminaries | Fluorescent lights/recessed |
| Wall Finishes | Cement plaster painted |
| Ceiling | Cement plaster painted |

*Milton Flores y Asociados, C.S.P.*                                                     *80*
*Real Estate Appraisers & Consultants*

**Condition/Effective Age**

The building areas were calculated from the appraiser's building sketch and data obtained from the actual owner. In summary, the subject property improvements have adequate size. Floor plans are functionally designed and laid out. Building improvements are in good condition. The quality and workmanship are considered to be good. The short-lived components such as the interior finishes; plumbing, ventilating, and electrical systems; are considered in good condition, the appraisal is being made on its "as is" condition. The actual effective age is estimated to be 1 year with a remaining economic life of 44 years for the building.

Analysis of the improvements "As Is":

| | |
|---|---|
| Economic Life: | 45 years |
| Condition: | Good |
| Effective Age: | New |
| Curable Physical Depreciation: | None |
| Incurable Physical Depreciation: | None |
| Curable Functional Obsolescence: | None |
| Incurable Functional Obsolescence: | None |
| External Obsolescence: | None |

After consulting constructions companies and comparing the subject property with other similar properties in the immediate neighborhood, the appraisers estimate that the building contains an adequate area. Physically, it appears to be soundly designed; architecturally and typically. Attached to and made a part of this report are photographs portraying the general appearance of the site.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*81*



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*82*



## Planta Enmendada
Escala : 3/16 " = 1' - 0"

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*83*



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*84*

  

  

  

  

  

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*85*








*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

## Zoning

The Puerto Rico zoning maps for **Cabo Rojo Municipality** indicates that the subject property falls under Agrícola and Reserva Uno category (AR-1). This classification has a wide range of permitted land uses. According to local officials, commercial permits could be issued by OGPE and the City of Cabo Rojo for the subject property as currently improved, therefore any project like the subject property will conform with all zoning regulations and classifications.



## Topography



The subject site has a level topography with adequate surface water drainage towards the front.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                      *87*
*Real Estate Appraisers & Consultants*

## Soil Survey

During the site analysis and field inspection, any soils studies were available.  Nevertheless, the appraisers estimate based on the type of construction next to the subject property, that this soil could be used for most urban uses and structures. The appraiser is not responsible for hidden conditions that might exist.



*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

88



## Map Unit Legend

| Map Unit Symbol | Map Unit Name | Acres in AOI | Percent of AOI |
|---|---|---|---|
| DsC | Descalabrado clay, 2 to 12 percent slopes | 22.6 | 8.8% |
| DsD | Descalabrado clay, 12 to 20 percent slopes | 0.6 | 0.2% |
| JaB | Jacana clay, 0 to 5 percent slopes | 11.1 | 4.3% |
| JaC | Jacana clay, 5 to 12 percent slopes | 6.5 | 2.5% |
| ScA | San Anton clay loam, 0 to 2 percent slopes, occasionally flooded | 89.2 | 34.5% |
| SsB | Sosa sandy loam, 2 to 5 percent slopes | 38.2 | 14.8% |
| SsC | Sosa sandy loam, 5 to 12 percent slopes | 6.2 | 2.4% |
| Ua | Urban land | 73.7 | 28.6% |
| VaA | Vayas silty clay, 0 to 2 percent slopes, occasionally flooded | 10.1 | 3.9% |
| **Totals for Area of Interest** | | **258.1** | **100.0%** |

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

## Environmental Condition

No environmental impact studies were made in conjunction with this appraisal. The value estimate contained herein could be impacted by subsequent environmental impact studies, research, investigation and resulting government actions.

## Hazardous Substances

The presence of certain materials, such as asbestos, urea-formalde-hyde, radon gas, and others can have a significant negative impact upon the value of improved properties.  Subsoil hazardous waste can impact the valuation of both vacant and improved properties.  The existence of hazardous material, which may or may not be present on the property, was not observed by the appraisers during the inspection of the site.  The appraisers have no knowledge of the existence of such materials on or in the properties.  The value estimate in this appraisal assumes that there are no hazardous materials. The client is advised to request an environmental audit if desired.

## Utilities and Services

All required municipal services and other government services are available at and for the site: fire and police protection, fire hydrants, street cleaning, garbage pick-up and daily postal delivery. The property also has electric power, telephone, sanitary and storm sewers, cable TV, and water. Garbage collection is available from private companies and from the municipal government.

## Easements, expropriations and encroachments

The site is affected by normal utility easement for power, water, telephone, etc.  There are no apparent adverse easements, encroachments, or other apparent adverse conditions.

## Conclusion of Site Analysis

The subject site size, exposure, configuration and frontage to depth proportion are adequate for commercial use.  It has all utilities and government services available.  It enjoys a good location and access to all points of Cabo Rojo Municipality. The neighborhood's infrastructure is adequate to support the existing improvements or any other similar improvements.  In summary, the subject site has all the characteristics, amenities and functional utility necessary to support its highest and best use, considering its good location.

*Milton Flores y Asociados, C.S.P.*                                                    *90*
*Real Estate Appraisers & Consultants*

## Highest and Best Use

What appraisers call "Highest and Best Use" is an important step in the process of estimating the value of any properties. Appraisers estimate the Highest and Best Use of a property first assuming the site is unimproved and vacant (even if it is improved and occupied). They identify that use which, in their opinion, would be the best development of the properties in terms of its total worth. Then the appraisers do a second Highest and Best Use analysis of the property as improved to identify what could be done to the existing improvements to make the property more valuable.  The highest and best use of the land as vacant and available may be different from that of the improved properties if the improvement is an inappropriate use. The existing use will continue unless and until land value in its highest and best use exceeds the sum value of the entire properties in its existing use and the cost to remove the improvements. This type of analysis is used by the appraiser as the basis for the site value estimate, sales comparison approach, cost approach, income approach and the remainder of the valuation process. The following tests must be passed in determining the highest and best use:

The use must be within the realm of probability; that is, it must be likely, not speculative, or conjectural.

- The use must be legal.
- Demand must exist for such use.
- The use must be profitable.
- The use must produce the highest net return to the land as well as the properties.
- 

In estimating the highest and best use, four stages of analysis must be conducted:

*Possible Use:* Determine the physically possible uses for the site.
*Permissible Use:* Determine what uses are legally permitted for the subject site.
*Feasible Use:* Determine which possible and permissible uses will produce a net return to the subject site.
*Most profitable use:* Determine which use among the feasible uses is the most profitable of the subject site.

Since the appraisal of the subject properties are based on a particular premise of use, the highest and best use analysis determines just what this premise of use should be. As stated above, a highest and best use analysis consists of considering the highest and best use of a property under two assumptions: First, with a vacant and available site and second, with the propertiesas improved. These two assumptions on highest and best use are correlated into one final estimate of highest and best use.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

## Land as if Vacant and Available

The first major aspect of the highest and best use analysis is considering the property as if it were vacant and available for development. This assumption is made to determine whether the land alone is worth more than the existing property, "as is". In other words, this is the beginning benchmark to compare with the highest and best use of the properties "as is", to determine whether the site is presently under-utilized.

*Possible Use* - The physical characteristics of the site impose the first constraints on any possible use of the property. The appraised tract is an irregular shaped tract located at PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico. The site is level, highly visible from the street, and is considered suitable for commercial improvements. Although no soil report has been reviewed, it is the appraiser's opinion that the soil has sufficient load bearing capacity to support construction. All public utilities are available on the street and capacity for utilities doesnot appear to be a limitation.

*Permissible use* - Because of its size and shape, the parcel has potential for many uses. The legal restrictions applicable to the site consist of zoning regulations enforced by the Municipality of Cabo Rojo and the Planning Board of Puerto Rico. The present zoning classification of commercial encourages the use of the subject property for commercial as allowed by the Municipality and the Planning Board of PR clearly a definition consonant with the present use of the subject property and surrounding properties. Environmental conditions and rural infrastructure are adequate to support the present use, and its current use appears to legally conform to the current zoning ordinance.

*Feasible Use* – The current market value of the subject is driven by its current use. A general shortage of developable sites in this neighborhood has sustained land prices, encouraged development of marginal sites, and demolition of those buildings that no longer produce economic return, case in point, rapid development along PR Road 100. Outdated buildings are being acquired and demolished to make way for more modern structures that can produce greater economic return.

It is my opinion that the use of the subject site for commercial property appears feasible in the current market. Demand exists for commercial facilities in the area, this type of development would produce a positive return to the land.

*Milton Flores y Asociados, C.S.P.*                                                    *92*
*Real Estate Appraisers & Consultants*

***Most Profitable Use*** - In the final analysis, a determination must be made as to which feasible use is the highest and best use of the parcels as if vacant. Based on the current demand for commercial space, coupled with the limited number of potential sites with the same characteristics as the subject property, if the site was available today, the highest and best use would be for commercial. Although several uses might be attracted to the site, the presence of commercial sites in the area and the site's good access indicate the commercial use to be the highest and best use.

### Ideal improvements analysis

Factors that create value have been identified in the neighborhood analysis. This analysis will allow the appraiser to interpret how the market reacts to the presence or absence of these value-creating factors. The neighborhood analysis also provides necessary information to make age and life estimates. Conclusions drawn from the neighborhood analysis provide the basis for the appraiser's determination of the ideal improvements in the highest and best use analysis.

In the highest and best use analysis, the ideal improvement (based upon the neighborhood analysis) minus the existing improvement equals accrued depreciation. The ideal improvement is typically new; if the subject improvement is not new, it is likely that physical deterioration exists. The ideal improvement will contain all features dictated by the market. If the subject does not contain these features, or it contains disproportionate quantities (deficiency or super adequacy), it is likely that functional obsolescence exists. The ideal improvement will not be subject to any negative externalities; if the properties are subject to such externalities, it is likely that external obsolescence exists. After analyzing the neighborhood, and describing the ideal improvement, a complete quality and condition analysis of the subjects must be done to decide if depreciation exists.

As vacant, the economically viable use of the subject property would be for the development of a commercial building. The use of the subject properties for commercial is legally permissible; the location is excellent for commercial use due to easy access to major roads.

Properties with similar physical characteristics have been successfully developed located adjacent to the subject property. Although a recent event in the real estate market has entered a period of correction, the neighborhood has been recognized over the years to be strongest in Cabo Rojo Municipality in the last decade after often with a premium being paid for the location. Therefore, the appraiser does not predict that there will be any difficulty in selling or leasing commercial space in this area.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                        *93*
*Real Estate Appraisers & Consultants*

**Property as Improved**

The subject site is improved with a commercial building.  The improvements were designed for commercial use.  Commercial use is homogenous with the surrounding improvements with developments along the neighborhood.  Use of the property as commercial is permissible under the existing zoning ordinance.

*Physically Possible Use* – Physical considerations of the property as improved include the existing size, design, and condition of the improvements.  Based on an analysis of the physical characteristics of the property as improved, the current improvements represent a physically possible use.

*Legally Permissible* – The current building represents a legally conforming use and is compatible with surrounding land uses.

*Financially Feasible* – There are two potential highest and best uses: (1) continue as commercial use, (2) convert to residential use. Current demand for commercial use is strong in this market as shown by the occupancy of surrounding buildings of similar use in the immediate neighborhood. It is my opinion that conversion to residential use is not feasible now.  The return of residential use buildings in latest years has been low compared with the construction cost and potential rents. Furthermore, no capital expenditure (other than the repairs needed) is necessary for the property to continue as commercial units. The capital investment cost of conversion for residential building is estimated at $500,000.00. This would include interior and exterior redesigning, legal costs, marketing, and a profit for the developer.

*Most Profitable* – The appraiser have considered the nature of the improvements, uses of similar properties having like potential, demand for the subject's services and the uses permitted by the current zoning in my analysis of most profitable use and conclude the most profitable use to the fee simple interest would be the use as a commercial use building.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                              *94*
*Real Estate Appraisers & Consultants*

**Conclusion of Highest and Best Use**

Many uses are physically possible on the full utility served subject site.  Commercial uses would be possible on the site. This use is considered probable and financially supportable use of the subject property.

Furthermore, the subject property is adjacent to commercial developments making that use consistent and harmonious with the neighborhood.   In conclusion, the subject property seems to be ideally situated for commercial purposes.  It is located advantageously, and it enjoys good visibility and accessibility for both local and transient traffic.  The demand for frontage along the road for many different types of enterprises seems to have been sustained for the last several years.

There is every indication that this demand will continue as further growth in the area occurs. Based upon an analysis of the site's location, physical attributes, current zoning, the complementary nature of the neighboring development, the highest and best use of the subject property was concluded to be commercial as vacant and commercial as improved.

*Milton Flores y Asociados, C.S.P.*                                               *95*
*Real Estate Appraisers & Consultants*

## Methods of Valuation

In the estimation of actual value, the appraiser can select from three standard methods of valuation.

1.  Market Sales Comparison Approach.
2.  Cost Approach, and.
3.  Income Approach.

Any valuators or appraisers attempt to employ one or more of these methods to estimate the market value of any property.  Although it is prudent for the appraiser to consider the estimate of properties value in a number of different ways, not all procedures can be applied to all properties.  Often the non-availability of required information restricts the methods that may be applicable.  Time and manpower restrictions can also influence the choice of methods used to value properties, especially in mass appraisal situations.

Theoretically, if the information is available all approaches should be used in an appraisal.  Moreover, if the methods are completed correctly, then theoretically all should produce approximately the same estimate of value.  As a practical matter the appropriate information is not always available, and some valuation methods are better suited for some types of properties than others.  In the appraisal of properties, the numbers of valuations needed to be completed in each situation often make this extensive valuation approach untenable.  Thus, the appraisers generally settle upon one of the three standard approaches to valuate certain types of property.  For example, the market comparison approach is mainly used for residential houses and vacant sites, the cost approach is used for industrial facilities and special use properties, and the income approach is generally used to value income properties such as commercial properties, office buildings, hotels and shopping centers.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*                                          *96*

## The Market Sales Comparison Approach

Apart from the actual sale of the subject property, the most widely accepted, and often the best understood, method of deriving market value is the analysis of comparable sales and/or other market data from similar properties. Everyone who owns a home or a cottage will have some idea of their property's value. If a house down your street (or one of the condominiums in your building) sold recently, that sale will provide some idea of the value of your own property. Intuitively you will make those comparisons between your property and other similar properties that have sold (or that have not sold because their listing price is too high) and arrive at some notion of value for your own residence.

## Market Comparisons

As suggested, the market comparison valuation exercise involves the valuation of one property in comparison to the known value of other similar properties. The comparison process involves the identification of the essential features of the subject property and then compares these characteristics and overall impressions to the characteristics and values of others. The task is to ensure that the properties being compared are truly comparable and that they will therefore provide a good indication of the value of the subject.

If the appraiser has enough comparable property sales transactions, then the Market Comparison Approach can produce fairly accurate estimates of properties value. However, it should be noted that valuations completed for a present-day value are based upon a historical perspective and in this analysis the appraiser often makes the implicit assumption that things will continue as they have been. Correcting this assumption requires that the appraiser adjusts the conclusions derived from the sales transaction data for changed market conditions.

Reliance on market comparison information is also a foundation of the other standard approaches to value. For example, within the Cost Approach the land/site is most valued via market sales comparison analysis, and in the Income Approach "rents" are derived through a market comparison analysis. Primarily, for the property being appraised, comparable sales information should relate to other similar properties. Since these types of properties tend to have individual characteristics, to get true comparable properties and true estimate of comparable values, the appraiser did look for sales of comparable properties near the site being appraised. The greater the number and the closer the similarity, the easier the appraiser's task of comparison and estimate of value will be.

The Direct Sales Comparison Approach was considered appropriate and accurate for the site value at the cost approach section of the report. No comparable sales of similar properties were found recently sold or under an option to buy. The development of the sales comparison approach will indicate unreliable results.

*Milton Flores y Asociados, C.S.P.*                                              *97*
*Real Estate Appraisers & Consultants*

## The Cost Approach

In the estimation of value using the cost approach the appraiser is attempting to rationalize the purchasing behavior of people in the marketplace through a logical assumption, i.e., that people would pay no more for an object than the cost of substituting an equally desirable or functional alternative.  Thus, the cost approach attempts to value properties by estimating what it would cost to "replace" the properties.  However, as applied, the cost approach generally begins with the estimation of the maximum value for the properties through an analysis of what it would cost to reproduce the properties as if new.  Amounts are then deducted from this value to reflect losses in value due to all causes, e.g., obsolescence and physical deterioration. This produces an estimate of the market value contribution of the improvements. Then the value of land is added to arrive at the estimated market value of the properties. More specifically, the cost approach is typically completed in the following manner:

1)    Estimate the reproduction (or replacement) cost new of the existing improvements, [RCN], as of the Valuation Date.
2)    Make a deduction for the amount reflecting the physical deterioration present in the improvements. [RCNLD].
3)    Also make adjustments to this amount to reflect the functionality or utility of the property, i.e., deduct amounts reflecting all functional and external obsolescence impacting the property.   [Replacement Costs New Less Depreciation and Obsolescence - RCNLD&O] The resulting value will be an estimate of the contribution of the improvements to the market value of the subject property, depreciated for all causes.
4)    Land is then added at market value to produce the estimated Market Value of Property.

In the final analysis the cost new of a structure may have very little relationship with its current value in the marketplace.  Therefore, it is essential that the amount produced by the analysis of costs new be adjusted to consider current market conditions and any physical, functional or external depreciation considerations that may detract from the value of the property.  To estimate the site value as vacant, the appraiser could use the following procedures:

**The Direct Sales Comparison method**:  Vacant land sales or being considered as though vacant, located in the subject's market area, that have been sold in the recent past, are sought, inspected and analyzed.  Differences then are adjusted considering each element of comparison, resulting in an indication of value for the subject.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

**The Allocation Method**: is based on the principle of balance and the related concept of contribution which affirms that there is a normal or typical ratio of land value to property value for specific categories of real estate in specific locations.  The price paid for the property is distributed between land and building value according to the prevailing ratio between land and property abstracted from the market.

**The Extraction Method**:  Land value is extracted from the sale price of an improved property by deducting the value contribution of the improvements, which is estimated from their depreciated costs.

**The Subdivision Development Method**: The highest and best use is considered to be subdivision development.  Estimate the parcel value as if vacant were subdivided and sold subtracting the development cost from the Gross Sell Out and discounting the projected sales throughout the marketing period which is estimated by a periodical absorption.

**The Land Residual Method**: is used to value land when building value is known or can be accurately estimated; stabilized annual net operating income to the property is known or can be accurately estimated; both land and building capitalization rates can be extracted from the market. The net income imputable to the land of an income producing property is capitalized into an estimate of value.

**The Ground Rent Capitalization Method**:  Ground rents can be capitalized at an appropriate rate to indicate the market value of the site.

The sales comparison approach is the most common technique for site valuation.  Vacant land comparable sales are adjusted for difference on property rights transferred, financing conditions, sales conditions, market conditions, and location and physical characteristics. Following is a list of vacant comparable sales:

*Milton Flores y Asociados, C.S.P.*                                                          *99*
*Real Estate Appraisers & Consultants*

## Comparable Vacant Land Sale L-1



| | |
|---|---|
| Location | PR-301, KM 5.5, Boquerón Ward |
| | Cabo Rojo, PR |
| Seller | David Cartagena García |
| Buyer | Cabo Rojo Land Acquisition, LLC |
| Property Identification # | 403-000-002-15-000 |
| Coordinates | Lat: 17.99198924, Lon: -67.16696704 |
| Legal Notes | Deed #42, Jorge Morales Cordero, Lawyer |
| | Book: 146; Page: 135; Tract: 4,523 |
| Date | December 14, 2023 |
| Lot Size | 6.00 cuerdas |
| Improvements | Vacant |
| Sales Price | $900,000.00 |
| Value per Unit | $150,000.00 per cuerda |
| Zoning | Desarrollo Selectivo (DS) |
| Sales Concession/Term | None/All Cash To Seller |
| Access | Good and Efficient |
| Facilities-Utilities | All of urban character |
| Shape | Rectangular |
| Topography-Soils | Level, firm and compact |
| Flood Factor | Zone X, area of minimum flooding |
| Neighborhood | Commercial/Residential |
| Use at time of Sale | Vacant |
| Highest & Best Use | Commercial |

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                      *100*
*Real Estate Appraisers & Consultants*

**Comparable Vacant Land Sale L-2**



| | |
|---|---|
| Location | PR-3301, KM 1.7, Boquerón Ward |
| | Cabo Rojo, PR |
| Seller | Heriberto Padilla Camacho |
| Buyer | Joe Serrano Agosto |
| Property Identification # | 402-079-035-94-000 |
| Coordinates | Lat: 17.97405729, Lon: -67.19750536 |
| Legal Notes | Deed #53, Angel Padilla Martínez, Lawyer |
| | Book: 962; Page: 217; Tracts: 32,784 |
| Date | September 29, 2023 |
| Lot Size | 6.58 cuerdas |
| Improvements | Vacant |
| Sales Price | $655,000.00 |
| Value per Unit | $99,568.28 per cuerda |
| Zoning | Residential (R-G) |
| Sales Concession/Term | None/All Cash To Seller |
| Access | Good and Efficient |
| Facilities-Utilities | All of urban character |
| Shape | Rectangular |
| Topography-Soils | Level, firm and compact |
| Flood Factor | Zone X, area of minimum flooding |
| Neighborhood | Commercial/Residential |
| Use at time of Sale | Vacant |
| Highest & Best Use | Commercial |

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                    *101*
*Real Estate Appraisers & Consultants*

**Comparable Vacant Land Sale L-3**



Location                        PR-304, KM 2.7, Parguera Ward
                                Lajas, PR
Seller                          Gabriel García Maya, et al
Buyer                           Antonio Chéveres Mari, Eddie Rodríguez &
                                Jorge Méndez

Property Identification #       405-000-007-64-000
Coordinates                     Lat: 17.97438059, Lon: -67.03777356
Legal Notes                     Deed #68, Fernando Sepúlveda Silva, Lawyer
                                Book: Karibe; Page: Karibe; Tract: 18,619

Date                            October 7, 2022
Lot Size                        5.15 cuerdas
Improvements                    Vacant
Sales Price                     $600,000.00
Value per Unit                  $116,434.77 per cuerda
Zoning                          Conservación de Recursos (CR/O.g)
Sales Concession/Term           None/All Cash To Seller
Access                          Good and Efficient
Facilities-Utilities            All of urban character
Shape                           Rectangular
Topography-Soils                Level, firm and compact
Flood Factor                    Zone X/AE, area of no flooding and flood risk area
Neighborhood                    Commercial/Residential
Use at time of Sale             Vacant
Highest & Best Use              Commercial

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*
*Real Estate Appraisers & Consultants*

*102*

**COMPARABLE VACANT LAND SALES SUMMARY**

| | SQFT | Cuerda | Date of Sale | Sale Price | SP/Cuerda | Zoning | Highest & Best Use |
|---|---|---|---|---|---|---|---|
| 1 | Vacant | 6.00 | December 2023 | $900,000.00 | $150,000.00 | DS | Commercial |
| 2 | Vacant | 6.58 | September 2023 | $655,000.00 | $99,568.28 | R-G | Commercial |
| 3 | Vacant | 5.15 | October 2022 | $600,000.00 | $116,434.77 | CR/O.g | Commercial |

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                        *103*
*Real Estate Appraisers & Consultants*

Land was valued as if vacant and available for development to its highest and best use.  The above comparable sales were used to estimate the site market value of the subject property.

**Comparable vacant land sale one,** at $150,000.00-unit value per cuerda.  It is located at Cabo Rojo Municipality, the same municipality as the subject property. The intended use is commercial, it is rectangular shape, and it is a level site.  At the time of sale was vacant. The neighborhood is active and attractive for industrial enterprises.

**Comparable vacant land sale two,** at $99,568.28-unit value per cuerda.  It is located at Cabo Rojo Municipality, at a similar location to the subject property. The intended use is commercial, and it is a level site.  At the time of sale was found vacant. The neighborhood is active and attractive for commercial enterprises.

**Comparable vacant land sale three,** at $116,434.77-unit value per cuerda.  It is located at Lajas Municipality, the same municipality as the subject property. The intended use is commercial, it is in flood risk area, and it is a level site.  At the time of sale was found vacant. The neighborhood is active and attractive for commercial enterprises.

The primary appraisal purpose for the subject property of approximately 13.3 cuerdas is for the highest and best use and involves estimating the value of use for the land.  A market data analysis has been conducted to appraise the entire tract, using sales of similar tracts of land to develop an average value per unit for the subject property.  The market data approach considers actual sales of other similar vacant properties in the current real estate market.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                          *104*
*Real Estate Appraisers & Consultants*

**Comparable Sales Adjustments Analysis**

The above comparables sales were adjusted to reflect the difference with the subject property. They were adjusted by the factors influencing value in the real estate market. These factors were adjusted and explained as follows:

**Property Right Conveyed**; all the comparable were fee simple transfer, therefore, no adjustment was required to the comparables.

**Financing Terms**: all comparables were cash to seller transaction, no financing was provided by the seller.

**Conditions of Sale**; all comparables were made under typical information, seller and buyer were not motivated by undue influence and have all information needed at time of negotiation.

**Market Condition**: the appraiser believes an exposure time of 36 months and the marketing time of 24 months. The comparables were not adjusted since the sales transactions were made during a three-year period. Furthermore, no increase in real estate value was estimated for vacant properties in the areas during the last three years.

**Improvements Adjustments,** land value is extracted from the sale price of an improved property by deducting the value contribution of the improvements, which is estimated from their depreciated costs. The comparables were found vacant; therefore, no improvements were estimated for the comparables.

*Milton Flores y Asociados, C.S.P.*                                                                    *105*
*Real Estate Appraisers & Consultants*

**Location and all other physical Adjustments**

**Location**; all comparables have similar location to the subject property. All comparables are located at suburban neighborhoods close to residential, commercial, industrial, urban and rural areas with access to main roads with commercial influx at the neighborhood.

**Topography, shape and soils**, the subject property have level topography with irregular shape with compact, stable and drained soils. All comparables are similar to the subject property with level to topography and soils compact, stables and well drained.

**Flood Condition**; the subject property is located at a minimum flood risk area; the comparables one and two were located at minimum flood risk area adjustment was not required; the comparable three is located minimum and flood risk area; the comparables are competitive to the subject in terms of exposure, traffic, and neighborhood influences and accessibility, among others.

**Frontage & Access;** the comparable sales have frontage and direct access to main roads and the frontage area is also similar to the subject property.

**Facilities & View**; the subject property facilities and utilities are urban facilities. The view is typical and to other properties.  The comparables have similar facilities and views to the subject property.

**Zoning and Intended Use**; the subject property has agrícola and reserva uno (AR-1) zoning area classification, and the intended use is commercial. The comparables have DS, R-G and CR/O.g zoning with commercial intended use.

The range of value indications varies from $99,568.28 to $150,000.00 per cuerda. An extensive search and gathering data for comparables sales of sites between 5.15 to 6.58 cuerdas for commercial intended use land indicates a range value per square meter of $90,000.00 to $200,000.00 per cuerda.

The lack of uniformity within this market prevents the direct extraction of adjustments from the marketplace.  General analysis reflecting market behavior is utilized to determine which comparable sales are superior or inferior to the subject.  This analysis establishes value parameters for the subject, allowing for conclusion of value.  No time adjustment has been made to the comparable sales due to the difficulty in quantifying changing market conditions considering current slower economic conditions.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                    *106*
*Real Estate Appraisers & Consultants*

| Sale | Cuerda | Sales Comparison Analysis | Price/ Cuerda | Comparison |
|------|--------|---------------------------|---------------|------------|
| 1 | 6.00 | Overall, this site is competitive to the subject in terms of location, exposure, traffic, neighborhood influence and has access/frontage like subject site, which is a desirable characteristic. The topography is level and at street level. | $150,000 | Upper Limit |
| | | Subject Positioning | | |
| 3 | 5.15 | Competitive to the subject in terms of exposure, traffic, neighborhood influences, accessibility, intended use, flood condition, and location. The lot size is smaller than the subject property. | $116,434.77 | Lower Limit |
| 2 | 6.58 | Similar and competitive to the subject in terms of shape, facilities, view, location, and access. | $99,568.28 | Lower Limit |

The comparable sales are close to the subject property and overall are considered like the subject property. Land in the subject area is most purchased and analyzed at a price per square meter due to the larger site sizes.  Thus, the subject will be valued on a price per square meter basis.  After a field inspection and proper evaluation of all factors affecting the comparable sales, and based on the foregoing analysis, the appraiser estimates the market value of the subject property site by the sales comparison approach to be as follows:

*"As Is"*
*13.3 cuerdas @ $135,000 per cuerda = $1,795,500.00*

*Rounded to $1,800,000.00*

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                  *107*
*Real Estate Appraisers & Consultants*

**Valuation of the Improvements**

Construction and actual improvements costs have been calculated by the appraisers.  These costs include all labor and materials at local prices, normal contractors' overhead and profit, architectural and engineering fees, and indirect costs.  This data has been calculated by the appraiser using national published cost sources including the Marshall and Swift Valuation Service, a nationally recognized cost service with cost information on similar projects.  This publication provides data and current costs multipliers for the 50 states, plus the District of Columbia, Puerto Rico, Guam and Canada.  These costs include architect's fees, contractor's overhead and profit, and most of the financing cost.  Since some indirect development costs like interest on the construction and interim construction and permanent financing fees are not included, these indirect costs will be estimated and added to the indicated unit cost in order to obtain a replacement cost new estimate. The appraiser estimates these indirect costs to be 5% of the total indicated Marshall's unit costs.

*Entrepreneurial profit* forecast amount varies from property to property depending on the negotiation ability of the market participants and the market conditions. Subjectivity, as occurs in the whole appraisal process, is involved in the estimating of entrepreneurial profit. If based on proper analysis, however, the adjustment applied to entrepreneurial profit will be consistent with the marketplace. In this case the market did not produce enough information to derive the entrepreneurial profit from it. The appraiser decides to consult with building contractors and developers to estimate the entrepreneurial profit and as a result a 20% was considered reasonable by the aforementioned.

The appraiser consulted with experts in the construction sectors and compared actual construction costs in the industry with the ones indicated by Marshall and Swift Valuation Service.  Costs are calculated based on construction details of each building and all the other site improvements.  Depreciation has been estimated from the appraiser's observation of the physical improvements and the surrounding buildings.

The following is a breakdown of the cost estimate for the actual "As Is" improvements for the subject property.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                              *108*
*Real Estate Appraisers & Consultants*

### MARSHALL VALUATION SERVICE
### CALCULATOR COST FORM
#### Square Foot Cost
#### "As Is"

| | | |
|---|---|---|
| Subscriber making survey | : | Milton Flores |
| Date of Survey | : | 02/22/2025 |
| Name of Building | : | Commercial Building |
| Located at | : | PR State Road 100, KM 14.0, Boquerón Ward |
| | | Cabo Rojo, Puerto Rico |
| Occupancy | : | Tropical Housing (445) |
| Building class | : | Class B |
| Quality | : | Good |
| Exterior Wall | : | RC-CB |
| # stories & height per story | : | No. 1   Ht.  9 |
| Average floor area | : | 5,640.0 SQFT |
| Average perimeter | : | 310.0 square feet |
| Age and condition | : | Age: New; Condition: Good |
| Region | : | Eastern |
| Climate | : | Moderate |
| Base Sq. Ft. Cost | : | $230.00 |
| Heating, cooling, | | |
| Ventilation (Deduct Heat) | : | - 0.00 |
| Elevator deduction | : | - 0.00 |
| Miscellaneous | : | - 0.00 |
| Total lines 13 through 16 | : | $230.00 |
| Number of story multiplier | : | 1.000 |
| Height per story-multiplier | | |
| (line 7) | : | 1.000 |
| Floor area-perimeter | | |
| multiplier (lines 8 & 9) | : | 1.000 |
| Combined height and size | | |
| mult. (lns. 18 x 19 x 20) | : | 1.000 |
| Refined SF cost (17 x 21) | : | $230.00 |
| Current cost multiplier | : | 1.01 |
| Local multiplier | | .94 |
| Final Sq. Ft. cost | | |
| (Ln 22 x Ln 23 x Ln 24) | : | $218.36 |
| **USE** | | **$218.00** SQFT |

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                     *109*
*Real Estate Appraisers & Consultants*

**Subject Improvements Value "As Is"**

**Building Area**

| | | |
|---|---|---|
| 5,640.0 SQFT @ $218.00 | = | $1,229,520.00 |

**Plus, Indirect Cost (10%)**
Project manager
Project design and supervision,
Blueprints

| | | |
|---|---|---|
| Permits and Licenses | = | $122,952.00 |
| **Plus, Developer's Profit (20%)** | = | $245,904.00 |
| **Subtotal** | = | $368,856.00 |
| **Replacement Cost New** | | $1,598,376.00 |

**Additional Improvements**
Landscaping
Fence
Sidewalk concrete
Bases and curbs
Asphalt

| | | |
|---|---|---|
| Parking | = | $100,000.00 |
| | | |
| **Total Improved Value Building** | = | $1,698,376.00 |
| **Rounded to** | = | $1,700,000.00 |

**Depreciation Analysis**

*Depreciation* is the total loss in value of the property from physical deterioration and functional and economic or external obsolescence as measured against the cost of replacement new of the improvements. The adjusted cost is then added to the estimated value of the land to provide an indication of the total property value.

*Physical Deterioration* is the loss in value resulting from wear and tear in operation and exposure to the elements.

*Curable physical depreciation* may be defined as items of physical deterioration that are economically feasible to cure. Incurable physical deterioration: these are items that are not feasible or economically justifiable to correct. The cost of correcting the condition or effecting the cure is estimated to be greater than the anticipated return in utility, and ultimately in value.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                          *110*
*Real Estate Appraisers & Consultants*

This component is further subdivided in "short-lived items", or items that still have some utility and it is not feasible to correct them at the effective date of the appraisal, and "long-lived items" such as the bone structure of the improvements which are impossible or unjustifiable to correct for a long time.

*Economic feasibility* is indicated if the cost to cure is equal to or less than the anticipated increase in the value of the property (*The Dictionary of Real Estate, Third Edition, Appraisal Institute*).

**Curable Physical Depreciation**

The subject improvements are considered new and in good to excellent condition. No deferred maintenance or curable physical depreciation was required.

*Additional Improvements depreciation comments*; the additional improvements cost figures were taking from actual historic cost as told by the owner, the improvements are considered to be in good condition as it was appreciated by the appraiser at the date of the inspection, accrued depreciation is estimated. The additional costs were confirmed by contractors and the asphalt parking area and concrete paved area cost was obtained also from local contractors. The lump sum estimate was verified, and it is considered a reliable cost figure.

*Functional Obsolescence* is a loss in value caused by factors inherent within a building, such as changes in construction materials and techniques, which results in excess capital costs in existing property, lack of full use of space, and inability to expand or update the property.  It is a reduction in utility of the structure, or of one or more of its components, resulting from the decreased capacity of the structure or component to perform the function for which it was intended.

*External Obsolescence* is an incurable loss in value caused by negative influences outside the property itself, such as general economic conditions, availability of financing, or inharmonious property use. This kind of depreciation is almost always incurable and results from the fact that real estate is fixed in location and cannot be moved to alter the environmental forces acting upon it.

*Locational obsolescence*, one of its components, is usually specific to the subject property or to very few properties in its immediate neighborhood.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                    *111*
*Real Estate Appraisers & Consultants*

*Economic Obsolescence*, the other component, is generally market wide.  A major shift in mortgage loan rates, construction costs or property taxes could represent an economic obsolescence. The subject is well designed using modern construction techniques and standards.  Demand exists for the property as evidenced by comparables market sale level in the neighborhood. Because of these reasons, no functional obsolescence or external obsolescence were found affecting the subject property.

## Summary and Conclusions of Cost Approach

As indicated above, in the cost approach, an estimate is made of the current cost of replacement new of the improvements. This amount is then adjusted to reflect depreciation resulting from physical deterioration, wear and tear, and utility, based on personal inspection and comparison with component parts of similar new units. This analysis also recognizes factors of functional and external obsolescence. The land value was estimated by the analysis of comparable sales in the subject neighborhood area. Based on this analysis, the indicated value "As Is" of the subject property by the cost approach is as follows:

|  | "As Is" |
|---|---|
| **Replacement Cost Estimate** | $1,598,376.00 |
| **Less Depreciation** | $          0.00 |
| **Depreciated Value of the Improvements** | $1,598,376.00 |
| **Plus Additional Improvements** | $   100,000.00 |
| **Plus Land Value Estimate** | $1,795,500.00 |
| **Total Value** | $3,493.876.00 |
| **Rounded to** | $3,500,000.00 |

The value indicated by the cost approach indicates value of the real estate and fixed equipment, no value was estimated for the moveable equipment and intangibles.  In the cost approach, the cost new and the value of the facility were estimated using historical actual costs, appraisers' cost services, and supplier information.  Missing in the approach is the synergic value created by the time and effort required to locate and negotiate for acquiring the site, obtain all necessary zoning permits, build the facility, train the staff, and most importantly create a sufficient customer base to generate an adequate profit. Replacement cost figures used in the cost approach are for valuation purposes only if required by the lender.  No client or third party should rely on these figures for insurance purposes.  The definition of market value is not consistent with the definition of insurance value.

*Milton Flores y Asociados, C.S.P.*                                                                    *112*
*Real Estate Appraisers & Consultants*

## The Income Approach

The theory behind the Income Approach to value is that <u>property values reflect the present worth of anticipated or forecast future benefits.</u>  As such the Income Approach analyses the market anticipated benefits or income from a property and converts this revenue into an estimate of current value.  In general, there are a number of factors which influence the market value of real estate based upon its income:

1)   The value of a property is related to its expected potential income and the required market <u>rate of return</u> of the investment.
2)   The <u>risk</u> involved with the investment affects the rate of return required by the typical investor and thus the amount that such an investor is willing to pay for the property.
3)   The assessment value of "income" properties should be developed from anticipated income related to the real estate.

The <u>rate of return</u> is a measure of the productivity of the capital, or the amount of income received in respect of the investment made.  For income properties this rate is affected by a number of factors including the timing of the payments, the risk involved in receiving the payments, and the potential growth in the income stream.  The expected rate of return from a type of income stream is established by the current buying and selling activity in the marketplace and is based upon a comparison of the rates of return offered by other types of competitive investments.

The <u>risks</u> involved with a real estate investment include the risk that the owner will not receive the expected income from the property either from operation of the property or from future resale.  For example, in a shopping center there is a risk that some stores will be vacant and non-income producing for more time than is reasonably expected by the investor.  Investments with higher risks must therefore offer higher potential gains (rates of return) or command lower overall prices (or both) in order for them to be attractive to the investor. Acceptable levels of risk and return also depend upon the investment perspective of the purchaser and the rates of return available on competing investments.

The income approach bases property value on the amount, quality and duration of the rental income which the property is capable of generating.  This approach is best applied to appraisals of property which is purchased for its income-producing potential. The subject value does not lie in its income-producing ability.  Moreover, no recent comparables rentals were found in the neighborhood.  Therefore, the income approach to value has no application to this appraisal problem.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*    ***113***
*Real Estate Appraisers & Consultants*

## Reconciliation and Value Conclusions

This appraisal was made to express an opinion of the fair market value of the fee simple estate in real estate as if offered for sale on the open market.  Since the appraisal report is intended to estimate the market value of the subject property the values estimate where calculated "As Is". It's the appraiser's opinion that the valuation approaches utilized in this report provide reliable indications of market value. Application of the three appraisal methods resulted in the following indications of value for the subject property:

|  | **"As Is"** |
|---|---|
| **Sales Comparison Approach** | $1,795,500.00 Land Value at Cost Approach Section |
| **Cost Approach** | $3,500,000.00 |
| **Income Approach** | Not Developed |

Reconciliation is the step in the valuation process in which the relative significance, applicability, and defensibility of each value indication is weighed. The conclusion of value is based upon the appropriateness, accuracy and quality of evidence contained in the appraisal.

The property is located in a well-established, urban neighborhood, within convenient distance from employment, agricultural, education, recreation, and shopping facilities. The economic and demographic data of the community has been carefully analyzed. Considering the population growth and per-capita income, it is reasonable to expect continued mid-occupancy levels and the ability of the subject property to command competitive rental rates commensurate with the current economy.

The existing improvements are a legal use. It has been concluded that the highest and best use of the property is the continue use as commercial use.

The comparable data found in this appraisal was chosen from a large quantity of data. Data was considered in addition to the data displayed in the report.

All three approaches to value have been considered in this appraisal report. The Cost Approach indicated a value of $3,500,000.00, the Direct Sales Comparison Approach indicated a value of $1,795,500.00, and the Income Approach was not developed because it will lead to unreliable results. Although there is no great difference to resolve among the value indications, greater confidence has been placed in the Direct Sales Comparison Approach.

The vacant comparable sales of competitive sites were analyzed, and a reliable market value was concluded for the subject site as vacant.  Only qualitative comparison analysis was applied in the comparison process.  The replacement cost new of the improvements was estimated using the Marshall and Swift Valuation Services Cost Manual and historic costs of similar properties from the appraiser's office file.

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

*Milton Flores y Asociados, C.S.P.*                                                    *114*
*Real Estate Appraisers & Consultants*

The Direct Sales Comparison Approach was considered appropriate and accurate. The quantity of evidence provided by each comparable was sufficient. The few adjustments that were made were derived from the market. These sales reflect the actions of typical buyers for this type of property and, therefore, lead to a logical and well documented conclusion of value.

The Income Approach the quality of the comparable rental was not developed, no recent comparable rentals of similar properties were found in the neighborhood or comparable sites. The development of the income approach will lead to unreliable results.

As result of my appraisal and analysis, and considering all other available facts and circumstances pertinent to an estimate of value, it is my opinion that the estimated market value of the appraised property as of **February 22, 2025** is:

*"As Is"*
***THREE MILLION AND FIVE HUNDRED THOUSAND DOLLARS***
***($3,500,000.00)***

Milton Flores
MIE, CREA, Lic. #706EPA
General Certified Appraiser #162GC

*Appraisal Report of one level commercial site located at:*
*PR State Road 100, KM 14.0, Boquerón Ward, Cabo Rojo, Puerto Rico*

# *Curriculum Vitae*